**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

RIO GRANDE SILVERY MINNOW
(*Hybognathus amarus*);
SOUTHWESTERN WILLOW
FLYCATCHER (*Empidonax trailii
extimus*); DEFENDERS OF
WILDLIFE; FOREST GUARDIANS;
NATIONAL AUDUBON SOCIETY;
NEW MEXICO AUDUBON
COUNCIL; SIERRA CLUB; and
SOUTHWEST ENVIRONMENTAL
CENTER,

      Plaintiffs-Appellees,

v.

BUREAU OF RECLAMATION, an
agency of the United States; ROBERT
L. VAN ANTWERP, Lt. Gen., Chief
Engineer, Army Corps of Engineers;
UNITED STATES ARMY CORPS OF
ENGINEERS, an agency of the United
States; UNITED STATES OF
AMERICA; KEN SALAZAR,
Secretary, Department of the Interior;
MICHAEL L. CONNOR,
Commissioner, Bureau of
Reclamation; LARRY WALKOVIAK,
Regional Director, Bureau of
Reclamation; and KIMBERLY M.
COLLOTON, Lt. Col., Albuquerque

No. 05-2399
No. 06-2020
No. 06-2021

District Engineer,*

        Defendants-Appellants,

THE MIDDLE RIO GRANDE
CONSERVANCY DISTRICT; STATE
OF NEW MEXICO,

        Defendants-Intervenors-
        Appellants,

ALBUQUERQUE-BERNALILLO
COUNTY WATER UTILITY
AUTHORITY,**

        Defendant-Intervenor-Appellee,

---

*     Pursuant to Fed. R. App. P. 43(c), we have substituted as the Defendants-Appellants in this action: (1) Robert L. Van Antwerp, Lt. Gen., Chief Engineer, Army Corps of Engineers, for Joseph Ballard, General, Chief Engineer, Army Corps of Engineers; (2) Ken Salazar, Secretary, Department of the Interior, for Gale Norton, Secretary, Department of the Interior; (3) Michael L. Connor, Commissioner, Bureau of Reclamation, for Eluid L. Martinez, Director, Bureau of Reclamation; (4) Larry Walkoviak, Regional Director, Bureau of Reclamation, for Michael R. Gabaldon, Regional Director, Bureau of Reclamation; and (5) Kimberly M. Colloton, Lt. Col., Albuquerque District Engineer, for Tom Fallin, Lt. Col., Albuquerque District Engineer.

**     Albuquerque-Bernalillo County Water Utility Authority and Defendant-Intervenor-Appellee City of Albuquerque jointly moved to substitute the Authority, as the successor in interest to the City's water rights and water utility functions, for the City in Case Nos. 05-2399, 06-2020, and 06-2021. We grant the motion and substitute Albuquerque-Bernalillo County Water Utility Authority as Defendant-Intervenor-Appellee pursuant to Fed. R. App. P. 43(b).

-2-

RIO DE CHAMA ACEQUIA
ASSOCIATION,[***]

      Defendant-Intervenor,

CITY OF SANTA FE,

      Intervenor.[****]

---

STATE OF ARIZONA; CENTRAL
ARIZONA WATER
CONSERVATION DISTRICT;
IMPERIAL IRRIGATION DISTRICT;
METROPOLITAN WATER
DISTRICT OF SOUTHERN
CALIFORNIA; and ARIZONA
POWER AUTHORITY,

      Amici Curiae.

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-99-1320-JP)**

Robert J. Lundman, U.S. Department of Justice, Environment & Natural
Resources Division (Andrew C. Mergen and Ellen J. Durkee, U.S. Department of
Justice, Environment & Natural Resources Division; Sue Ellen Wooldridge,
Assistant Attorney General, with him on the brief(s)), Washington, D.C., for
Defendants-Appellants.

---

[***]    Defendant-Intervenor Rio de Chama Acequia Association entered an
appearance before the district court but did not participate in the appeal.

[****]    Intervenor City of Santa Fe entered an appearance on appeal but did
not otherwise participate.

Frances C. Bassett, Assistant Attorney General, State of New Mexico (Patricia A. Madrid, Attorney General, State of New Mexico; Stephen R. Farris and Karen L. Reed, Assistant Attorneys General, State of New Mexico; Tanya Trujillo, Amy Haas, and Josh Mann, Special Assistant Attorneys General, Office of the State Engineer and the New Mexico Interstate Stream Commission, with her on the brief(s)), Santa Fe, New Mexico, for the Defendant-Intervenor-Appellant State of New Mexico.

Charles T. DuMars (Christina J. Bruff, David Seeley, and Stephen Curtice with him on the brief(s)), Law & Resource Planning Associates, P.C., Albuquerque, New Mexico, for Defendant-Intervenor-Appellant Middle Rio Grande Conservancy District.

Alletta Belin, Belin & Sugarman, Santa Fe, New Mexico (Laurence ("Laird") J. Lucas, Advocates for the West, Boise, Idaho, with her on the brief), for Plaintiffs-Appellees.

Maria O'Brien (Adam H. Greenwood with her on the brief), Albuquerque-Bernalillo County Water Utility Authority, Albuquerque, New Mexico, for Defendant-Intervenor-Appellee Albuquerque-Bernalillo County Water Utility Authority.

Virginia S. Albrecht and Karma B. Brown, Hunton & Williams, LLP, Washington, D.C.; Kathy Robb, Hunton & Williams, LLP, New York, New York; W. Patrick Schiffer, Chief Counsel, Arizona Department of Water Resources, and Gregg A. Houtz, Deputy Counsel, Arizona Department of Water Resources, Phoenix, Arizona, as Amici Curiae in support of Appellants.

Before **HENRY**, Chief Judge, **BALDOCK** and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

This case involves one battle in a prolonged war over a finite and elemental resource—Rio Grande water. The needs of the plants and animals that depend upon this water for survival are in tension with the needs of the human inhabitants

-4-

of the Middle Rio Grande Valley (the "Valley") who depend upon the water for daily living and commercial and agricultural activities. Alleging that the Bureau of Reclamation ("Reclamation") failed to properly maintain the delicate balance between these counterpoised needs to the detriment of several endangered species, Defenders of Wildlife, Forest Guardians, National Audubon Society, New Mexico Audubon Council, Sierra Club, and the Southwest Environmental Center (the "Environmental Groups") sought relief in federal court pursuant to the Endangered Species Act ("ESA").

Directly at issue is whether Reclamation has discretion to reallocate water from agricultural and municipal contract users to maintain stream flows for the benefit of the Rio Grande Silvery Minnow ("Minnow"). The Environmental Groups claim that Reclamation does and that its failure to weigh that discretion in its consultations with the U.S. Fish and Wildlife Service (the "FWS") violated § 7 of the ESA.

At the outset, we commend the district court. When confronted with an extended and sometimes acrimonious dispute between bitterly opposed and firmly entrenched interests, it acted impartially, thoughtfully, and thoroughly. We are constrained, however, to disagree with the district court and conclude that intervening events have mooted the Environmental Groups' scope-of-consultation

claim under the ESA.[1]  We also conclude that the district court erred in denying

the appellants' motions for vacatur.  For the reasons stated below, we dismiss the

appeal and remand to the district court to vacate its memorandum opinions and

orders of April 19, 2002, September 23, 2002, and November 22, 2005, and to

dismiss the Environmental Groups' complaint with regard to their scope-of-

consultation claim under the ESA.

## I. BACKGROUND

### A.    Federal Involvement in the Valley

The human inhabitants of the Valley have, for centuries, used the Rio

Grande for irrigation.  In 1925, the Middle Rio Grande Conservancy District (the

"MRGCD") was formed to consolidate water rights and irrigation systems, and to

rehabilitate the existing irrigation systems in the Valley.  The MRGCD's

subsequent financial difficulties coupled with aggradation of the river channel led

to development of the Middle Rio Grande Project (the "Project"), one of two

major federal water projects impacting the Valley.  Approved by the Flood

---

[1]      The Middle Rio Grande Conservancy District filed a separate appeal challenging the district court's dismissal of its cross-claims against the government to quiet title to certain properties. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, No. 05-2293 (10th Cir. filed Sept. 9, 2005).  Although this quiet-title appeal was consolidated with the scope-of-consultation appeals for argument, it addresses distinct issues and was briefed separately.  The viability of this quiet-title cross-claim is not at issue in this appeal.  We have addressed the quiet-title cross-claim appeal in a separate opinion. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, No. 05-2293, 2010 WL 1135978 (10th Cir. Mar. 26, 2010).

Control Acts of 1948 and 1950, the Project consists of federally rehabilitated and/or constructed water-storage facilities, diversion dams, canals, drains, and levees. The other major water project in the Valley, the San Juan-Chama Project (the "San Juan-Chama"), imports water from the Colorado River Basin to the Rio Grande Basin. *See Rio Grande Silvery Minnow v. Keys* (*Minnow II*), 333 F.3d 1109, 1122–23 (10th Cir. 2003), *vacated as moot*, 355 F.3d 1215 (10th Cir. 2004).

## B.      The Endangered Species Act and the Minnow

Primarily at issue in this case is § 7(a)(2) of the ESA, codified at 16 U.S.C. § 1536(a)(2). Listing a species as endangered or threatened under 16 U.S.C. § 1533 triggers the ESA's provisions. *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000). Thus, the ESA's protections extended to the Minnow beginning in 1994 when the FWS listed it as endangered. The Minnow now occupies a small portion of its historic range, primarily existing in the San Acacia Reach—a sixty-mile stretch of river south of Albuquerque, New Mexico, and north of Elephant Butte Reservoir. Spring run-off triggers Minnow spawning. During drought years, the Minnow is allegedly jeopardized both by low spring run-off, which limits spawning, and, as the summer progresses and irrigation increases, by river drying in the San Acacia Reach, which increases adult Minnow mortality.

Section 7(a)(2) of the ESA provides, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action

authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Section 7 applies to "actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665–66, 669 (2007) (determining that the FWS's and the National Marine Fisheries Service's interpretation—that "§ 7(a)(2)'s no-jeopardy duty covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred"—was reasonable). 50 C.F.R. § 402.02, in turn, defines agency "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies."

Section 7(a)(2) imposes both a procedural and a substantive obligation on federal agencies. *Nat'l Ass'n of Home Builders*, 551 U.S. at 667; *New Mexico ex rel. Richardson v. Bureau of Land Mgmt*, 565 F.3d 683, 700 (10th Cir. 2009). "An agency's decision whether to take a discretionary action that may jeopardize endangered or threatened species is strictly governed by ESA-mandated inter-agency consultation procedures." *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). The procedural obligation ensures that the agency proposing the action (the "action agency") consults with the FWS to determine the effects of its action on endangered species and their critical habitat. *Fla. Key*

*Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008). To meet its procedural obligation, the action agency must first determine whether its proposed discretionary action may affect a listed species or a critical habitat. 50 C.F.R. § 402.14(a). If so, the agency must consult with the FWS.[2] *Id.* § 402.14(a), (c). During consultation, the FWS "evaluates the effects of the proposed action on the survival of [the] species and any potential destruction or adverse modification of critical habitat" and, "based on 'the best scientific and commercial data available,'" formulates a biological opinion (also referred to here as "B.O."). *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008) (quoting 16 U.S.C. § 1536(a)(2)).

The B.O. is prepared by the FWS at the conclusion of consultation. It is a written statement determining whether the proposed action "is likely to jeopardize the continued existence of listed species."[3] 50 C.F.R. § 402.14(g)(4). "If the

---

[2] The FWS and the National Marine Fisheries Service administer the ESA. 50 C.F.R. § 402.01(b). The "FWS has jurisdiction over freshwater and terrestrial species while the National Marine Fisheries Service is responsible for anadromous and marine species." *Johanns*, 450 F.3d at 457 n.1 (citing 50 C.F.R. § 402.01(b)).

[3] "[F]ormal consultation culminates in the [FWS's] issuance of [a] biological opinion[] . . . ." *Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 26 (1st Cir. 2001); *see also* 50 C.F.R. § 402.14(*l*)(1) ("Formal consultation is terminated with the issuance of the biological opinion."). "The issuance of a biological opinion is considered a final agency action, . . . subject to judicial review." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 790 (9th Cir. 2005) (per curiam). Therefore, to attack the scope of a consultation that has resulted in a biological opinion, a plaintiff may bring suit pursuant to the

(continued...)

biological opinion concludes that jeopardy is not likely and that there will not be

adverse modification of critical habitat, or that there is a 'reasonable and prudent

alternative[ ]' to the agency action that avoids jeopardy and adverse modification

and that the incidental taking of endangered or threatened species will not violate

section 7(a)(2), the consulting agency can issue an 'Incidental Take Statement' . .

. ."[4] *Nat'l Wildlife Fed'n*, 524 F.3d at 924. An Incidental Take Statement ("ITS")

---

[3](...continued)
Administrative Procedure Act ("APA"). *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1235 (9th Cir. 2001) (citing 5 U.S.C. § 704).

To challenge the agency's failure to undertake consultation in the first instance, however, a plaintiff may utilize the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A). Under this provision, "any person may commence a civil suit . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority [of the ESA]; . . . ." *Id.* The APA governs judicial review of agency action challenged through the ESA citizen-suit provision. *See* 5 U.S.C. § 706; *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1249 (10th Cir. 2001); *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998). In this case, therefore, the Environmental Groups' prayer that the district court direct Reclamation to consult with the FWS pursuant to § 7(a)(2) constitutes a request for mandatory injunctive relief and falls within the purview of the citizen-suit provision of the ESA. *See Coal. for Sustainable Res., Inc.*, 259 F.3d at 1249–50.

[4]        Section 9 of the ESA prohibits a "take" of any species listed as endangered. *See* 16 U.S.C. § 1538(a)(1)(B). The term "take" is defined broadly to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The term "harm" includes any "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. However, § 9's protection of endangered and threatened species is not as broad as that provided by § 7 because § 9 cannot be enforced "until an animal has actually been killed or

(continued...)

"constitutes a permit authorizing the action agency to take the endangered or threatened species so long as it respects the [FWS's] terms and conditions." *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (internal quotation marks omitted). If an action agency receives a jeopardy opinion, the action agency can comply with its substantive obligation under § 7(a)(2) only if it "'terminate[s] the action, implement[s] the proposed alternative, or seek[s] an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e).'" *Fla. Key Deer*, 522 F.3d at 1139 (quoting *Nat'l Ass'n of Home Builders*, 127 S. Ct. at 2526).

## C.    Procedural History

On November 15, 1999, the Environmental Groups filed an ESA citizen suit seeking both injunctive and declaratory relief, in part, for Reclamation's and the Army Corps of Engineers' (the "Corps") failure to fully consult with the FWS pursuant to § 7(a)(2) of the ESA prior to issuing an October 1999 biological assessment. The Environmental Groups contended that Reclamation and the Corps possessed "significant discretion over virtually all aspects of their funding and operation of the . . . Project, and therefore they must consult with the FWS on all of these actions." J.A. at 277. The suit prompted several contract water users,

---

[4](...continued)
injured." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 703 (1995).

including the MRGCD and the State of New Mexico, to intervene.

On June 29, 2001, the FWS issued a biological opinion ("2001 B.O."). As a result, the Environmental Groups filed a second amended complaint contesting the validity of the 2001 B.O. and again raising Reclamation's and the Corps' alleged failure to consult with the FWS to the fullest extent of their discretionary authority.

On April 19, 2002, the district court affirmed the 2001 B.O. on substantive grounds, leaving the remainder of the Environmental Group's claims for later resolution. On the procedural front, however, the district court concluded that "[Reclamation] retains sufficient discretion over its river management and operations in the middle Rio Grande, specifically water deliveries under the . . . Project and under the San Juan-Chama . . . , to require [Reclamation] to consult over those actions under Section 7(a)(2) of the ESA."[5] *Id.* at 173. We subsequently dismissed the intervenors' appeal of the April 19 order for lack of standing and dismissed the federal agencies' appeal because the order was not subject to interlocutory review. *Rio Grande Silvery Minnow v. Keys* (*Minnow I*), 46 F. App'x 929, 933–34, 935 (10th Cir. 2002) (per curiam).

On September 4, 2002, the Environmental Groups sought emergency

---

[5]    The district court found that the Corps did not have discretion in the operation of the Project and San Juan-Chama reservoirs sufficient to require consultation pursuant to the ESA. The Environmental Groups have not appealed this finding.

injunctive relief, alleging that a drought year was endangering the Minnow and asking the court to order the federal defendants to meet the flow requirements of the 2001 B.O. On September 12, 2002, the FWS issued a biological opinion ("2002 B.O.") in which it determined that, although Reclamation's operations in the Valley were likely to jeopardize the Minnow, there existed no reasonable and prudent alternative ("RPA") to alleviate the jeopardy.

Consequently, on September 19, 2002, the Environmental Groups filed a third amended complaint challenging the 2002 B.O. They continued to press their allegation that Reclamation "failed to consult fully . . . over all aspects of their Middle Rio Grande water operations and related decision-making activities," the key elements of which included their decisions not to reduce water to the MRGCD and not to use San Juan-Chama water for the benefit of the Minnow. J.A. at 516–17. The Environmental Groups sought a declaration that both the 2001 B.O. and the 2002 B.O. were arbitrary and capricious, an order requiring the federal agencies to complete full consultation through issuance of a legally adequate biological opinion, and an order requiring the federal agencies to "take all steps within their discretionary authority necessary to conserve" the Minnow. *Id.* at 527.

In a September 23, 2002 Memorandum Opinion addressing the Environmental Groups' motion for an injunction, the district court chided Reclamation for having failed to timely reinitiate consultation despite the

-13-

persistent historic drought and "clear guidance that it had discretion to consult with the FWS about limiting or reducing contract deliveries under the [San Juan-Chama] and the [Project]." *Id.* at 208. Because the FWS could formulate no RPA that avoided jeopardy to the Minnow, the district court determined that the 2002 B.O. was arbitrary and capricious. Moreover, it concluded that Reclamation was empowered to release San Juan-Chama water,[6] to restrict future contract deliveries of both San Juan-Chama and Project water, and to restrict diversions by the MRGCD. An appeal ensued.[7]

While the appeal was pending, the FWS issued a March 16, 2003 biological opinion ("2003 B.O."). The FWS used a "depletion-based approach" for purposes of determining the scope of the proposed federal action. *Id.* at 923. That is, the FWS, Reclamation, the Corps, and other interested parties consulted "on the effects of total river depletions on listed species, without identifying particular aspects of the overall action as 'discretionary or non-discretionary.'" *Id.* The

[6] In its order and partial final judgment, the district court noted that, at that time, drought conditions created insufficient water to meet the 2001 B.O.-mandated flow rates without jeopardizing water availability in future irrigation seasons. Therefore, the court ordered release of water to meet lesser flow rates than the 2001 B.O. required, but ordered flow rates to increase to those mandated by the 2001 B.O. later in the year.

[7] Although a divided panel of this court affirmed the district court's preliminary injunction, *Minnow II*, 333 F.3d at 1138, the panel later concluded that the appeal was moot and vacated the opinion. *Rio Grande Silvery Minnow v. Keys* (*Minnow III*), 355 F.3d 1215, 1222 (10th Cir. 2004). Though noting that the preliminary injunction entered by the district court was unenforceable, the panel did not vacate the district court's order and partial final judgment. *Id.*

-14-

FWS concluded that the proposed actions would likely jeopardize the continued existence of the Minnow. Similarly, the FWS analyzed the threat to the Minnow and developed RPAs "based on biological needs of the species, independent of sources of water and discretionary authority." *Id*. at 921.

In recognition of the district court's prior orders and the pending appeal, however, Reclamation proposed different measures it could use to avoid jeopardy to the Minnow, depending on the ultimate determination of the scope of its discretion. Under the first proposal, Reclamation assumed that it had no discretion to limit contract deliveries to benefit the Minnow and proposed a supplemental water program by which it would lease water from willing lessors to enhance river flows when necessary. Under the second proposal, Reclamation assumed that it had discretion to limit diversions, curtail water storage, and release stored water belonging to both contract users and the Native American tribes and vowed to strive to allot shortages between all users.

Meanwhile, in December 2003, Congress enacted a rider to the Energy and Water Development Appropriations Act, 2004, Pub. L. No. 108-137, § 208, 117 Stat. 1827, 1849–50 (2003) (the "2003 minnow rider"). The 2003 minnow rider placed San Juan-Chama water beyond Reclamation's discretionary reach. § 208, 117 Stat. at 1849. Additionally, Congress deemed conformity with the 2003 B.O.'s RPAs and ITS as full compliance with the ESA's requirements for a two-year period. *Id*. at 1849–50. Congress enacted a second rider in 2004, which

-15-

extended the ESA adequacy of the 2003 B.O.'s RPAs and ITS through March 2013. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 205, 118 Stat. 2809, 2949 (2004) (the "2004 minnow rider"). Finally, on November 19, 2005, Congress amended the 2004 minnow rider and extended its ESA-satisfaction coverage to include "any amendments" to the 2003 B.O. Energy and Water Development Appropriations Act, 2006, Pub. L. No. 109-103, § 121(b), 119 Stat. 2247, 2256 (2005).[8]

---

[8] As amended, the 2004 minnow rider provides as follows:

(a) Notwithstanding any other provision of law and hereafter, the Secretary of the Interior, acting through the Commissioner of the Bureau of Reclamation, may not obligate funds, and may not use discretion, if any, to restrict, reduce or reallocate any water stored in Heron Reservoir or delivered pursuant to San Juan-Chama Project contracts, including execution of said contracts facilitated by the Middle Rio Grande Project, to meet the requirements of the Endangered Species Act, unless such water is acquired or otherwise made available from a willing seller or lessor and the use is in compliance with the laws of the State of New Mexico, including but not limited to, permitting requirements.

(b) Complying with the reasonable and prudent alternatives and the incidental take limits defined in the Biological Opinion released by the United States Fish and Wildlife Service dated March 17, 2003 and any amendments thereto combined with efforts carried out pursuant to Public Law 106-377, Public Law 107-66, and Public Law 108-7 fully meet all requirements of the Endangered Species Act (16 U.S.C. 1531 et seq.) for the conservation of the Rio Grande Silvery Minnow (Hybognathus amarus) and the Southwestern Willow Flycatcher (Empidonax trailii extimus) on the Middle Rio Grande in New Mexico.

(continued...)

-16-

Following the issuance of the 2003 B.O., the passage of the 2003 minnow rider, and our dismissal of the preliminary injunction appeal as moot, the Environmental Groups acknowledged that "there is no further relief that can be issued at this time upon the existing claims in Plaintiffs' lawsuit." J.A. at 1630. They sought dismissal but requested that the district court not vacate its prior orders. Agreeing that the case was moot, the appellants urged vacatur. The Environmental Groups then sought to withdraw their motion to dismiss, claiming that their scope-of-consultation claim was not mooted by intervening events because the violation was likely to recur.

On November 22, 2005, although recognizing that congressional action mooted the Environmental Groups' claims as to San Juan-Chama water,[9] the

---

[8](...continued)
> (c) This section applies only to those Federal agencies and non-Federal actions addressed in the March 17, 2003 Biological Opinion.

> (d) Subsection (b) will remain in effect until March 16, 2013.

§ 205, 118 Stat. at 2949, *as amended by* § 121(b), 119 Stat. at 2256. Legislative history reveals that Congress differentiated between San Juan-Chama and Project water because the former is not native to the Rio Grande Basin, but imported from another watershed. 149 Cong. Rec. S10896 (daily ed. Aug. 1, 2003) (statement of Sen. Bingaman). Therefore, the Minnow did not enjoy the benefit of San Juan-Chama water prior to the diversion, and, consequently, the absence of San Juan-Chama water was not deemed to contribute to the decline of the Minnow. *Id.* at S10896–97.

[9]     The district court granted the Environmental Groups' and the City of Albuquerque's stipulation and joint motion for dismissal of all claims regarding

(continued...)

district court rejected the contention that the Environmental Groups' scope-of-consultation claim as to Project water was moot. Rather, the court determined that the FWS's issuance of the 2003 B.O., and Reclamation's adoption of it, constituted a voluntary cessation with respect to Reclamation's failure to consider the alleged full scope of its discretionary authority. Absent Reclamation's and the FWS's assurances that they would continue to operate under the discretionary option in the 2003 B.O., the district court determined that they failed to meet their burden of establishing mootness. Additionally, the district court entered a declaratory judgment requiring Reclamation and the FWS to consider, in future consultations, Reclamation's discretion to reallocate Project contract water. Finally, assuming *arguendo* that the case was moot, the court concluded that vacating its 2002 memorandum opinions and orders would not be appropriate and in the public interest. This appeal followed.

## II. DISCUSSION

### A. Intervening Events have Mooted the Environmental Groups' Scope-of-Consultation Claim

#### 1. Standard of Review

We have no subject-matter jurisdiction if a case is moot. *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1146–47 (10th Cir.

---

[9](...continued)
the San Juan-Chama and dismissed the claims with prejudice.

-18-

2007).  We review questions of mootness de novo.  *R.M. Inv. Co. v. U.S. Forest Serv.*, 511 F.3d 1103, 1107 (10th Cir. 2007).

"'Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction.'" *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). "'Without a live, concrete controversy, we lack jurisdiction to consider claims no matter how meritorious.'" *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007)). Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit. *See Unified Sch. Dist. No. 259*, 491 F.3d at 1147 ("Actions seeking a declaratory judgment must comport with the same mootness principles as any other suit." (internal quotation marks omitted)). As we noted in *Cox v. Phelps Dodge Corp.*, "[i]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff."  43 F.3d 1345, 1348 (10th Cir. 1994) (brackets, en dash, and internal quotation marks omitted), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1071, 1072 (codified at 42 U.S.C. § 1981a), *as recognized in Walker v. UPS Inc.*, 240 F.3d 1268, 1278 (10th Cir. 2001).  "'The crucial question is

-19-

whether granting a *present* determination of the issues offered will have some

effect in the real world.'" *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212

(10th Cir. 2005) (emphasis added) (quoting *Citizens for Responsible Gov't State*

*Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).

### 2. Challenges to the 2001 and 2002 Biological Opinions are Moot

The appellants challenge the district court's determination that the FWS's

issuance of the 2003 B.O. did not moot the Environmental Groups' claims.[10]  To

determine whether any claim remains for review, we must ascertain what type of

---

[10]     The district court identified three prospective ESA claims:  (1) Count I—a violation of § 7(a)(2); (2) Count II—a violation of § 7(a)(1); and (3) Count IV—a violation of § 9.  The federal agencies imply that only the § 7(a)(2) claim remains for determination.  The MRGCD indicates that it is unclear whether the district court found the § 7(a)(1) and § 9 claims to be moot.  Concluding that such a ruling by the district court would be "perplexing," the MRGCD nonetheless announces its intention to operate under that "apparent ruling" and "challenges only the district court's holding as to the § 7(a)(2) claim."  Aplt. MRGCD Br. at 18.  However, the Environmental Groups appear to reject the notion that the justiciability of only the § 7(a)(2) claim is at issue.  *See, e.g.*, Aplees. Br. at 33 ("In his November 2005 opinion and final judgment, Judge Parker concluded this case is not moot, because relief was still needed to remedy these adjudicated violations of the ESA [referring back to the three claims noted above].");  *id.* at 27 n.8 ("Plaintiffs . . . have always asserted that the case as a whole was not moot.").  And the district court appeared to expressly conclude that the scope-of-discretion issue underlay all three prospective ESA claims.  *See* J.A. at 239 ("The issue of federal agency discretion underlies each of these claims.").  Thus, under that reasoning, all three claims would stand or fall together under the mootness analysis of this case.  Ultimately, however, given our holding that the case is moot with regard to the ESA scope-of-consultation claim, this dispute among the parties regarding which specific ESA causes of action survived the district court's rulings is immaterial to our analysis.

relief the Environmental Groups seek, and whether we can, at this juncture, afford

them meaningful relief.[11]  *See S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724,

---

[11]      On appeal, the Environmental Groups sought leave to supplement the record with documents not reviewed by the district court, claiming that they are relevant to demonstrate that the case is not moot.  "This court will not consider material outside the record before the district court."  *United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000).  And, although we have inherent authority to allow supplementation of the record, this is a rare exception to Fed. R. App. P. 10(e).  *Id.* at 1192.  "'Rule 10(e) allows a party to supplement the record on appeal but does not grant a license to build a new record.'"  *Shooting Star Ranch, LLC v. United States*, 230 F.3d 1176, 1177 n.2 (10th Cir. 2000) (quoting *Kennedy*, 225 F.3d at 1191).

In support of their motion, the Environmental Groups rely on cases in which appellate courts allowed post-judgment supplementation of the record to show that actions occurring subsequent to judgment mooted the case.  *See, e.g., Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992) (en banc); *Cedar Coal Co. v. United Mine Workers of Am.*, 560 F.2d 1153, 1166 (4th Cir. 1977).  However, the Environmental Groups' reliance on these cases is misplaced because, as we conclude *infra*, the case was moot *prior to* the district court's entry of judgment.  *See Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*, 457 F.3d 376, 380 n.1 (4th Cir. 2006) (affirming district court's determination that several claims were moot, and denying plaintiff's motion to supplement the record on appeal on issue of mootness because district court did not have the evidence before it when it entered judgment); *Cedar Coal Co.*, 560 F.2d at 1166 (agreeing to consider new information on appeal only with regard to the issue of mootness "because there was no mootness question before the district court").  We consequently deny the motion to supplement.

The State of New Mexico requests that we strike those portions of the Environmental Groups' response brief that cite to the supplemental appendix. Because we deny the Environmental Groups' motion to supplement the record, we grant the State of New Mexico's request to the extent that the Environmental Groups relied on the now-prohibited supplemental appendix in their briefing.

Finally, the Environmental Groups move to strike portions of the MRGCD's reply brief or, in the alternative, to file a surreply.  The arguments the

(continued...)

727 (10th Cir. 1997).

The Environmental Groups essentially contend that, since the Minnow's listing as endangered, and continuing to the date of the filing of the third amended complaint, Reclamation has failed to fully consult. They prayed for a declaration[12] that the federal agencies are violating § 7(a)(2) by failing to consult on all discretionary aspects of the federal action, and for an injunction ordering full consultation. Because only the 2001 B.O. and 2002 B.O. had been issued when the Environmental Groups filed their third amended complaint, we must therefore interpret their pleadings as directed at the 2001 B.O. and 2002 B.O. The Environmental Groups' allegations of legal wrongdoing must be grounded in a concrete and particularized factual context; they are not subject to review as

_____

[11](...continued)
MRGCD addressed in its reply brief that allegedly exceed the scope of the arguments fairly addressed by the Environmental Groups in their response brief deal exclusively with the merits of the case. Because we resolve the case on mootness grounds, we do not reach the merits. Thus, the Environmental Groups' motion is itself moot.

[12] "[D]eclaratory judgment actions often require courts to face the difficult task of distinguishing 'between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies.'" *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (quoting *Kardules v. City of Columbus*, 95 F.3d 1335, 1343–44 (6th Cir. 1996)). "Thus, the Supreme Court has held that when considering the potential mootness of a claim for declaratory relief, the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 459 (internal quotation marks omitted) (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974)).

free-floating, ethereal grievances. *See Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 251 F.3d 1007, 1010 (D.C. Cir. 2001) ("To determine whether anything remains of NMA's case, we need to identify which regulations NMA challenged and whether the new rules altered those regulations."). And only the 2001 B.O. and 2002 B.O. were extant targets for their allegations.

The problem for the Environmental Groups, however, is that neither the 2001 B.O. nor 2002 B.O. still exists. After the Environmental Groups filed their third amended complaint, the FWS issued the 2003 B.O., which superseded both of them. The 2003 B.O. establishes a new regulatory framework under which the propriety of Reclamation's actions must be judged. The Environmental Groups have not argued that the 2003 B.O. is a mirror image of the two biological opinions that it supplanted, nor could they. Nor have they asserted that the changes are "only superficial[]." *Conservation Law Found. v. Evans*, 360 F.3d 21, 26 (1st Cir. 2004).

We must conclude that the FWS's issuance of the 2003 B.O. mooted the Environmental Groups' prayer for both injunctive and declaratory relief. If we issued an injunction directing Reclamation to consult concerning the biological opinions at issue in this litigation, it would have no effect in the real world because those biological opinions have been superseded. Indeed, even as to the 2003 B.O., a consultation injunction would be meaningless because the federal agencies already have consulted. "An injunction ordering consultation [using an

-23-

expanded scope] is no longer warranted. There is no point in ordering an action that has already taken place." *S. Utah Wilderness Alliance*, 110 F.3d at 728.

Furthermore, any declaration that the 2001 B.O. and 2002 B.O. were insufficient due to Reclamation's failure to fully consult would be wholly without effect in the real world. The Environmental Groups insist that we are situated to provide *some* relief, especially declaratory relief regarding the scope of Reclamation's discretion in consultation. However, the Environmental Groups have not been able to point to some concrete ongoing injury. *See Cox*, 43 F.3d at 1348 ("[T]his court has explained that a plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured [by the defendant] in the future." (alteration in original) (internal quotation marks omitted)). As the regulations governing formal consultation, 50 C.F.R. § 402.14, and reinitiation of formal consultation, 50 C.F.R. § 402.16,[13] demonstrate, the duty to consult is not itself an ongoing agency action subject to challenge. *See Sierra Club v. Yeutter*, 926 F.2d 429, 439–40 (5th Cir. 1991) ("Once an agency submits a plan that has been agreed to through the section 7 consultation process, the court then, applying the arbitrary and capricious standard of review, must approve or disapprove it."). In other words, the

---

[13] Pursuant to 50 C.F.R. § 402.16, reinitiation of consultation is required when the action agency exceeds the take specified in the ITS, new information arises that was not previously considered, the action is modified, or a new species or critical habitat is listed.

Environmental Groups cannot challenge the scope of consultation untethered from the federal agencies' efforts to develop a biological opinion. The consultation process culminates in the issuance of a biological opinion.[14] *Water Keeper Alliance*, 271 F.3d at 26. And, in this case, that biological opinion has now been issued (i.e., the 2003 B.O.).

The Environmental Groups' concerns about whether Reclamation will appropriately consult with the FWS in response to changing water-demand conditions are far too speculative to support a claim for declaratory relief. Any such relief would amount to an advisory opinion regarding the scope of Reclamation's discretion and such an opinion would clearly be improper. *See S. Utah Wilderness Alliance*, 110 F.3d at 730 ("SUWA has not shown that the defendants are likely to violate section 7(a)(2) in the near future."); *see also Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007) (concluding that a claim for declaratory relief regarding allegedly improper regulatory policy was mooted by governmental agency's listing of killer whale species as endangered, which was "ultimate objective" of environmental advocacy

---

[14] We agree with the federal agencies that the Environmental Groups' reliance on the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997), in arguing that their claims under the citizen-suit provisions of the ESA should not be deemed moot, irrespective of the mootness status of their APA claims, is "perplexing." Fed. Aplts. Reply Br. at 17. *Bennett* did not involve questions of mootness and is not germane to the Environmental Groups' argument.

appellants; the fact that agency employed the allegedly improper policy in effecting the listing did not alter the mootness calculus because it was "too speculative" that this policy in the future "*might* adversely affect" listed species or affect "*other*" killer whale species); *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, No. 04-3096-PA, 2007 WL 1072112, at *5 (D. Or. Apr. 3, 2007) ("Plaintiffs also argue that declaratory relief would be helpful to 'ensure that the [new] BiOp complies with the law and does so in a timely manner' and that declaratory relief would 'clarify and settle' defendants' legal obligations. I agree with defendants, however, such justifications are so vague as to make Article III's 'case or controversy' requirement meaningless. Courts should not micromanage an agency's procedures under the guise of judicial review.").

We addressed an analogous situation in *Wyoming*. There the State of Wyoming successfully brought a NEPA challenge before the district court against a rule of the U.S. Forest Service, "commonly known as the 'Roadless Rule,' that generally prohibited road construction in inventoried roadless areas on National Forest System lands." 414 F.3d at 1210. During the pendency of the appeal by certain environmental group defendant-intervenors, the Forest Service issued a final rule that replaced the Roadless Rule, and we concluded that "the new rule has mooted the issues in th[e] case" and dismissed the appeal. *Id.* In particular, we noted that "[t]he portions of the Roadless Rule that were substantively challenged by Wyoming no longer exist." *Id.* at 1212. Furthermore, we reasoned

that "the alleged procedural deficiencies of the Roadless Rule are now irrelevant because the replacement rule was promulgated in a new and separate rulemaking process." *Id.* As in *Wyoming*, to the extent that the Environmental Groups seek a declaration that the 2001 B.O. and 2002 B.O. are legally infirm due to Reclamation's failure to consult using the full scope of its discretion, we are not situated to issue a *present* determination with real-world effect because those regulations no longer are operational—for all material purposes, they no longer exist. And, because of that fact, we likewise are not situated to cure any purported procedural irregularities in Reclamation's consultation behavior concerning those opinions. Thus, the Environmental Groups' claims are moot. *See also Colo. Off-Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1135 (10th Cir. 2004) ("Plaintiff's challenge to the *1997* Decision Notice and its request for declaratory and injunctive relief is moot. The *1998* Routt Forest Plan and its accompanying [off-road vehicle] use policy now governs the Routt National Forest making Plaintiff's attack on the 1997 Decision Notice futile." (emphasis added)); *cf. Camfield v. City of Okla. City*, 248 F.3d 1214, 1223 (10th Cir. 2001) ("Because parties have no legally cognizable interest in the constitutional validity of an obsolete statute, a statutory amendment moots a case to the extent that it removes challenged features of the prior law[.]" (internal quotation marks and citations omitted)).

On these facts, cases of our sister circuits also are instructive. For

-27-

example, in *American Rivers v. National Marine Fisheries Service*, the Ninth

Circuit summarized plaintiffs' challenge as follows:

> The plaintiffs alleged that the 1994-1998 Biological Opinion
> [issued by the National Marine Fisheries Service] violated §
> 7(a)(2) of the ESA. Specifically, American Rivers contended
> that the federal defendants violated the ESA by relying on the
> transportation of Snake River smolts to conclude that the 1994-
> 1998 operations of the River Power System are unlikely to
> jeopardize the continued existence of the listed salmon.

126 F.3d 1118, 1122 (9th Cir. 1997) (footnote omitted). However, during the

course of the litigation, the National Marine Fisheries Service "issued a new

biological opinion ("1995 Biological Opinion") which superseded the

[challenged] 1994-1998 Biological Opinion." *Id.* at 1123. With little difficulty,

the Ninth Circuit concluded that plaintiffs' action was moot. *Id.* at 1124 ("[T]he

biological opinion in the present case has been superseded by the 1995 Biological

Opinion. Therefore, any challenge to the 1994-1998 Biological Opinion is

moot.").

The D.C. Circuit reached a similar conclusion in *National Mining Ass'n*.

At issue there was "the validity of several federal regulatory requirements

imposed on permit applicants, and the procedures for contesting the accuracy of

information used to determine permit eligibility." 251 F.3d at 1009. The permits

were issued under the Surface Mining Reclamation and Control Act, 30 U.S.C. §

1201 *et seq.*, and its implementing regulations; no one could engage in surface

coal mining without such a permit. *Id.* After oral argument, the Interior

-28-

Department revised the regulations that governed some of the challenged regulatory requirements and procedures and, consequently, the D.C. Circuit was "faced with additional questions concerning the extent to which the case is now moot." *Id.*

After identifying the regulations that were the subject of appellant's challenge, the D.C. Circuit determined that the Interior Department's revisions to those regulations rendered appellant's attack upon them moot. *Id.* at 1010–11. In particular, the D.C. Circuit stressed that the revisions effected "substantial changes" to the previously existing regulatory regime, thus altering the real-world conditions and eliminating the possibility of meaningful relief. *Id.* at 1011. The court noted: "The old set of rules, which are the subject of this lawsuit, cannot be evaluated as if nothing has changed. A new system is now in place." *Id.* Accordingly, the D.C. Circuit determined that the revisions mooted appellant's challenge. *See also Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1096 (9th Cir. 2003) (holding ESA § 7 and § 9 claims moot when challenged permits were issued pursuant to superseded biological opinion); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (holding that the same rule of mootness applies where an agency "would no longer be relying on the particular biological opinion that was being challenged, but rather upon a new opinion," and "where an agency will be basing its ruling on different criteria or factors in the future").

The relevant case law thus strongly counsels in favor of a conclusion of

mootness here. Due to the FWS's issuance of the 2003 B.O., we can provide no effective relief. The Environmental Groups did not challenge the 2003 B.O., and it currently governs Reclamation's disposition of the water at issue. That B.O. has altered the real-world parameters within which Reclamation operates, creating a new regulatory context for assessing its compliance with its ESA obligations.

The Environmental Groups' reliance on the Ninth Circuit's decision in *Forest Guardians v. Johanns* is unavailing. In that case, the Forest Service and the FWS engaged in comprehensive management and monitoring of lands used for grazing that ultimately allowed the Forest Service to presume that the FWS concurred each year in a no-jeopardy finding for parcels of land covered by its plan. *Johanns*, 450 F.3d at 458–59. When the Forest Service did not comply with the management and monitoring requirements, the plaintiff brought suit claiming that consultation should be reinitiated. *See id.* at 459–60. The Forest Service then reinitiated consultation and subsequently received the FWS's concurrence in its no-jeopardy finding. *Id.* at 461.

In holding that the Forest Service's subsequent reinitiation of consultation did not moot the plaintiff's claims, the court distinguished our decision in *Southern Utah Wilderness Alliance*. The court observed that the monitoring requirements were on-going action that would extend through the lease term. *Id.* at 462. Additionally, the court determined that the Forest Service was likely to continue its "practice of not complying with the monitoring requirements,"

especially because it argued that compliance was not required. *Id*. The court, therefore, determined that a "[d]eclaratory judgment in favor of Forest Guardians would thus ensure that the Forest Service does not continue to fail to meet its monitoring responsibilities in the future and that it fulfills its duty under the ESA to consult with FWS when necessary." *Id*. Consequently, the court concluded that, although the plaintiff's request for an injunction was mooted by reinitiation of consultation, a declaratory judgment would, nevertheless, provide relief. *Id*. at 462–63.

The absence of an on-going ESA violation makes this case distinguishable from *Johanns* and more akin to *Southern Utah Wilderness Alliance*. *See S. Utah Wilderness Alliance*, 110 F.3d at 728–30 (finding plaintiff's claim, seeking declaratory judgment for the Bureau of Land Management's alleged failure to consult with the FWS as required by § 7(a)(2), moot when agencies subsequently completed informal consultation). Unlike the Forest Service in *Johanns*, Reclamation is not currently engaged in the same behavior that was the subject of the Environmental Groups' objections. Instead, the FWS issued a superseding B.O. with which Reclamation is complying. Thus, we are constrained to conclude that the issuance of the 2003 B.O. mooted the Environmental Groups' scope-of-consultation claim under the ESA.

### 3. Voluntary Cessation

The Environmental Groups argue, and the district court held, that the

-31-

scope-of-consultation claim was not mooted by the issuance of the 2003 B.O.

because Reclamation voluntarily ceased the alleged objectionable behavior.  We

disagree.

"One exception to a claim of mootness is a defendant's voluntary cessation

of an alleged illegal practice which the defendant is free to resume at any time."

*Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 892 (10th Cir.

2008).  "The rule that 'voluntary cessation of a challenged practice rarely moots a

federal case . . . traces to the principle that a party should not be able to evade

judicial review, or to defeat a judgment, by temporarily altering questionable

behavior.'"  *Unified Sch. Dist. No. 259*, 491 F.3d at 1149 (quoting *City News &*

*Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)).  "In other

words, this exception exists to counteract the possibility of a defendant ceasing

illegal action long enough to render a lawsuit moot and then resuming the illegal

conduct."  *Chihuahuan Grasslands Alliance*, 545 F.3d at 892.

Voluntary actions may, nevertheless, moot litigation if two conditions are

satisfied:  "(1) it can be said with assurance that there is no reasonable

expectation that the alleged violation will recur, and (2) interim relief or events

have completely and irrevocably eradicated the effects of the alleged violation."

*County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation

marks, elipses, and citations omitted).  "[V]oluntary cessation of offensive

conduct will only moot litigation if it is clear that the defendant has not changed

-32-

course simply to deprive the court of jurisdiction." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam). The party asserting mootness bears the "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (alteration in original) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

In practice, however, *Laidlaw*'s heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case.[15] Thus, even when a legislative body has the power to re-enact an ordinance

---

[15] Indeed, despite *Laidlaw*'s heavy burden, some courts have expressly treated governmental officials' voluntary conduct "with more solicitude" than that of private actors. *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988); *see Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (noting that "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity"), *petition for cert. filed*, 77 U.S.L.W. 3657 (U.S. May 22, 2009) (No. 08-1438). The Fifth Circuit in *Sossamon* opined that this solicitude, which effectively places a comparatively lighter burden of proof on governmental officials, was "reconcilable" with the Supreme Court's heavy-burden language in *Laidlaw* because "government[al] actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." 560 F.3d at 316; *see also* 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.5, at 236, 238–39 (3d ed. 2008) (noting that in a mootness analysis courts must undertake to make predictions, including as to "the probability of recurrence," and that the "process of prediction also is shaped by the character of the defendant—claims of discontinuance by public officials are more apt to be trusted

(continued...)

or statute, ordinarily an amendment or repeal of it moots a case challenging the ordinance or statute.  *See Camfield*, 248 F.3d at 1223; *see also Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994) ("A statutory change, however, is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.  As a general rule, if a challenged law is repealed or expires, the case becomes moot."); 13C Wright, Miller & Cooper, *supra* note 15, § 3533.6, at 259 ("The legislative

_____

[15](...continued)
than like claims by private defendants"); 13C Wright, Miller & Cooper, *supra* note 15, § 3533.7, at 319, 321 (noting that "[c]ourts are more likely to trust public defendants to honor a professed commitment to changed ways").  Some of our other sister circuits have expressed similar sentiments and even suggested that "when the defendant is not a private citizen but a government[al] actor, there is a rebuttable presumption that the objectionable behavior will *not* recur."  *Troiano v. Supervisor of Elections in Palm Beach County*, 382 F.3d 1276, 1283 (11th Cir. 2004); *accord Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006).  The federal agencies and the State of New Mexico have alluded to this public/private distinction in asserting that the voluntary-cessation exception should not preclude a determination of mootness here.  *See* Fed. Aplts. Reply Br. at 14 n.13 (distinguishing a case cited by the Environmental Groups because it "addresses a private party's voluntary cessation of challenged conduct; not the situation here . . . where a challenged final agency action is wholly replaced with a new final agency action" (citation omitted)); State of New Mexico Reply Br. at 12 (noting that the parties here "include governmental agencies acting pursuant to public policies that have been approved at the local, state, and federal levels" and that "[t]his distinction is critical").  We need not definitively opine here on what explicit measure—if any—of greater solicitude is due administrative agencies in the application of the voluntary-cessation exception. We are confident that, even under *the general practice* of courts in applying *Laidlaw*'s heavy-burden standard in the governmental context, the federal agencies' actions here do not bar our conclusion of mootness due to application of the voluntary-cessation exception.

rules established by statute or administrative regulation may shift as an action progresses. Ordinarily courts respond by applying the law in force at the time of decision . . . . Mootness may result because the change has *removed any basis* for a claim, or has fully satisfied the claim."(emphasis added)); 13C Wright, Miller & Cooper, *supra* note 15, § 3533.6, at 277 ("Repeal . . . likewise moots attacks on a statute."). Indeed, in this governmental context, "[m]ost cases that deny mootness rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways." 13C Wright, Miller & Cooper, *supra* note 15, § 3533.6, at 311 (emphasis added). More specifically, when a legislature repeals or amends a statute after it is judicially challenged, we have concluded that the voluntary-cessation exception has no application "where there is no evidence in the record to indicate that the legislature intends to reenact the prior version of the disputed statute." *Camfield*, 248 F.3d at 1223–24. In *Camfield*, we distinguished the Supreme Court's decision in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), where the Court determined that the action was not moot, by noting that *Aladdin's Castle* "preclud[es] a mootness determination in cases challenging a prior version of a state statute only when the legislature has openly expressed its intent to reenact the challenged law." *Id.*

Likewise, the "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies." *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991); *see, e.g.*, *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 246

(5th Cir. 2006) ("Corrective action by an agency can moot an issue.").  And the "mere possibility" that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy.  *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983).  A case "cease[s] to be a live controversy if the possibility of recurrence of the challenged conduct is only a 'speculative contingency.'"  *Burbank v. Twomey*, 520 F.2d 744, 748 (7th Cir. 1975) (quoting *Hall v. Beals*, 396 U.S. 45, 49 (1969)).

Guided by these principles, we proceed to apply the two-part test of *County of Los Angeles* here.  We conclude that the district court erred in applying the voluntary-cessation exception to the mootness doctrine in this case.  Our de novo review of the record convinces us that the appellants have met their burden of establishing mootness.

The first part of the test requires us to inquire whether we can say with assurance that "'there is no reasonable expectation' that the alleged violation will recur."  *County of Los Angeles*, 440 U.S. at 631.  Our review of the record assures us that, in light of intervening events, there is no reasonable expectation that Reclamation will revert to using the same consulting process which resulted in the 2001 B.O. and 2002 B.O.  Although the district court's September 23, 2002 order no doubt played a role in the FWS's issuance of the 2003 B.O., the absence of evidence here that the federal agencies used the issuance of the new B.O. merely to defeat the district court's jurisdiction weakens the implication that they

manipulated the system. *See Chihuahuan Grasslands Alliance*, 545 F.3d at 893 ("Nothing in the record presented to us indicates the BLM's termination of the leases at issue constitutes a 'voluntary cessation' of illegal conduct made in an effort to evade judicial review or avoid judgment by temporarily altering questionable behavior."); *Sossamon*, 560 F.3d at 325 ("We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct."); *see also* 13C Wright, Miller & Cooper, *supra* note 15, § 3533.7, at 326 (noting that although governmental defendants might take action as a direct response to litigation, "[a]t any rate, self-correction again provides a secure foundation for mootness so long as it seems genuine"); *cf. Save Greers Ferry Lake, Inc. v. Dep't of Def.*, 255 F.3d 498, 501 (8th Cir. 2001) ("[W]hile the district court's preliminary injunction clearly had the salutary effect of prompting the Corps to reevaluate its issuance of the FONSI [Finding of No Significant Impact], withdraw the 2000 SMP [Shoreline Management Plan], and decide to prepare an EIS [Environmental Impact Statement], the injunction cannot continue in effect insofar as it purports to adjudicate the present or future legality of the withdrawn 2000 SMP and to order an EIS for the 2000 SMP.").[16]

---

[16]    As the federal agencies credibly noted:  "Adoption of the 2003 biological opinion was not an attempt to evade review.  Rather, the FWS issued and Reclamation adopted the March 2003 biological opinion in response to the

(continued...)

-37-

Moreover, "we are not here presented with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease." *Burbank*, 520 F.2d at 748; *see also* 13C Wright, Miller & Cooper, *supra* note 15, § 3553.7, at 351–52 (noting that a conclusion of mootness ordinarily does not "follow announcement of an intention to change or adoption of a plan to work toward lawful behavior"). Instead, the FWS took the concrete step in 2003 of issuing a new biological opinion. This 2003 B.O. superseded and rendered obsolete the two biological opinions that provided the framework for the Environmental Groups' challenge to Reclamation's scope of discretion. This 2003 B.O. established a new regulatory context for assessing the propriety of Reclamation's conduct under the ESA. Therefore, there is no reasonable expectation that Reclamation's actions could give rise to the scope-of-discretion issue in the same (or essentially the same) manner that gave rise to the Environmental Groups' challenge. *See County of Los Angeles*, 440 U.S. at 632 (concluding that use of unvalidated civil service exam unlikely to recur because, following commencement of litigation, city instituted new method of screening job applicants and increasing minority representation in fire department).

We do recognize that Reclamation has not abandoned its narrow view of

---

[16](...continued)
district court's orders and *changing factual conditions*, not in an effort to evade sanctions or review." Fed. Aplts. Br. at 37 (emphasis added).

the scope of its discretion.[17]  Specifically, Reclamation provided for an option to

achieve the 2003 B.O.'s RPAs that was consistent with its narrow view and

contrary to the district court's rulings concerning the scope of its discretion.

However, even if Reclamation's reservation of this narrow-discretion option

suggests *some* possibility that it would revert to its narrow scope-of-discretion

---

[17]      In support of application of the voluntary-cessation exception, both
the district court and the Environmental Groups have relied upon the federal
defendants' failure to renounce their position concerning the scope of
Reclamation's discretion (i.e., to acknowledge the correctness of the district
court's conclusion that Reclamation in fact has discretion concerning the
allocation of the water at issue away from private contracting parties).  Although
the failure of a governmental agency to acknowledge the impropriety of its
former, challenged course of conduct certainly is not an irrelevant factor in the
voluntary-cessation analysis, it is not dispositive.  *Compare Camfield*, 248 F.3d at
1223 (distinguishing the Supreme Court's decision in *Aladdin's Castle* by noting
that it "preclud[es] a mootness determination in cases challenging a prior version
of a state statute only when the legislature has *openly expressed its intent to
reenact the challenged law*" (emphasis added)), *and* 13C Wright, Miller &
Cooper, *supra* note 15, § 3533.6, at 311 (noting that "[m]ost cases that deny
mootness rely on *clear showings* of reluctant submission and a desire to return to
the old ways" (emphasis added)), *with Conservation Law Found.*, 360 F.3d at
26–27 (applying voluntary-cessation exception to defeat mootness because
agency's pronouncements defending its challenged procedural practices "d[id] not
suggest a change of heart"), *and* 13C Wright, Miller & Cooper, *supra* note 15, §
3533.7, at 345 ("It is equally easy to deny mootness if officials who have changed
their practices warn that former practices may be resumed at any time. . . .
Although *not as significant*, a failure to disclaim resumption *may count* in
denying mootness." (emphasis added)).  Under the totality of the circumstances of
this case, which include (1) the concrete steps taken by the federal agencies to
adopt a new regulatory framework in the 2003 B.O. for handling water-allocation
issues, and (2) as discussed *infra*, the likely extended duration of this new
framework in view of the minnow riders, we cannot conclude that Reclamation's
failure to renounce its narrow view of its discretion should lead us to a different
conclusion concerning the inappropriateness of applying the voluntary-cessation
exception here.

view should it avoid the precedential effects of the district court's orders—through, for example, a mootness determination and vacatur—that possibility likely would not be sufficient to warrant application of the voluntary-cessation exception. *See Ala. Hosp. Ass'n*, 702 F.2d at 961 (noting that the "mere possibility" that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy). Moreover, even if we accorded that possibility some persuasive force on the voluntary-cessation question, we would recognize that if the scope-of-discretion issue does arise again it would be in a different regulatory context than that challenged by the Environmental Groups (i.e., the 2001 B.O. and 2002 B.O.). Consequently, the precise issue that was the subject of the Environmental Groups' action is no longer extant, and it would not be reasonably likely to recur through Reclamation's actions. *See Unified Sch. Dist. No. 259*, 491 F.3d at 1150 ("[T]he 'allegedly wrongful behavior' in this case is highly fact- and context-specific, rather than conduct that is likely to 'recur' on similar facts and in the same context. In such a case, the 'voluntary cessation' doctrine is inapplicable, because our review of future instances of 'wrongful behavior' may be quite different than the complained-of example that already has ceased.").

Moreover, significantly, the change effected by the 2003 B.O. is likely to be rather lengthy in duration. *See Burbank*, 520 F.2d at 748 (noting that the court was not "faced with a situation where the order is of brief duration and the

-40-

plaintiff may well be again confronted with the challenged conduct when the order terminates"); *see also* 13C Wright, Miller & Cooper, *supra* note 15, § 3553.7, at 341 (noting that "[t]emporary compliance with a decree pending appeal, for example, clearly should not moot a case").  As noted, through Congress's enactment of the minnow riders, the ESA adequacy of the 2003 B.O.'s RPAs and ITS has been assured until March 2013.  Under these circumstances, it is unlikely that the Reclamation would give up the protective shield constructed by the minnow riders during the ten-year period and revert to substantially the same discretionary approach that it followed in the 2001 B.O. and 2002 B.O. in consulting concerning a new biological opinion.

The district court expressly concluded that the minnow riders did not militate against application of the voluntary-cessation exception.  Significantly, however, in reaching this conclusion, the district court apparently did not consider the amendment to the 2004 minnow rider that had been enacted only three days before its ruling.  Tellingly, the district court stated:

> Movants [federal agencies] have failed to establish that it is
> absolutely clear that they would not return to their wrongful
> use of an impermissibly narrow and limited scope of discretion
> in future ESA consultations.  The 2004 minnow rider is
> conditional:  it protects the 2003 BO only if the federal
> agencies comply with the ITS and RPA, and *only to the extent
> that the 2003 BO is not amended*.  It is virtually a certainty
> that there will be more ESA consultations in the near future
> over water operations in the middle Rio Grande. . . . All the
> considerations that affect water operation decisions on minnow
> survival such as climate, water availability, the understanding

of minnow biology, and so forth, are subject to change, meaning the issue of the scope of discretion is likely to recur.

J.A. at 240–41 (emphasis added). The district court's application of the voluntary-cessation exception therefore appears to have been grounded on a false premise—*viz.*, that the minnow riders would ensure that Reclamation's actions pursuant to the 2003 B.O. comported with the ESA only so long as the 2003 B.O. was not amended. In fact, even through a series of amendments to the 2003 B.O. over the ten-year life span of the minnow riders, Reclamation's conduct can still remain insulated from ESA attack, so long as it conforms to that B.O. In sum, *County of Los Angeles*'s first inquiry does not support a conclusion of voluntary cessation.

The second part of the *County of Los Angeles* test requires little discussion here. Under that part, we examine whether interim events have "completely and irrevocably eradicated the effects of the alleged violation." 440 U.S. at 631. After undertaking this inquiry, we can identify no lingering effects from the federal agencies' alleged violations of the ESA in connection with the issuance of the 2001 and 2002 biological opinions. As discussed at length *supra* Part II(A)(2), any injury inflicted upon the Environmental Groups by Reclamation's purported failure to consult to the full scope of its discretion in connection with the 2001 and 2002 biological opinions cannot be said to have survived the issuance of the 2003 B.O., which superseded and replaced those opinions.

-42-

In bolstering its case against mootness, the Environmental Groups contend the scope-of-discretion issue is still significant and has a day-to-day impact on Reclamation's ability to effectively comply with the flow requirements of the 2003 B.O. *See* Aplees. Br. at 35 ("The extent of the Bureau's authority to alter operations of El Vado Dam or the MRG Project diversion dams affects the success of its efforts every day to comply with the flow requirements of the 2003 BO. If the Bureau has broad discretion to control water operations, it is also more likely to be able to purchase necessary water, because water rights holders will know that, one way or another, the Bureau will have to obtain enough water to avoid jeopardy."). However, as the federal agencies correctly note, the Environmental Groups have not filed a claim or sought relief with respect to Reclamation's day-to-day activities in complying with the 2003 B.O. And ordinarily it would not be appropriate for a federal court to be in the business of monitoring such day-to-day compliance activities in any event. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004) ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such [broad] congressional directives is not contemplated by the APA."); *see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006).

In sum, we simply are unable to conclude that the FWS's issuance of the 2003 B.O., and Reclamation's adoption of it, provide the appropriate foundation

for application of the voluntary-cessation exception of the mootness doctrine. Accordingly, this litigation is moot with regard to the scope-of-consultation claim, and the district court erred in denying the appellants' motions to dismiss the action for lack of subject-matter jurisdiction.

### 4. The Dissent's Objection to the Standard of Review

The dissent contends that we have incorrectly applied a de novo standard of review to the voluntary-cessation exception to the mootness doctrine. Dissent at 2. In particular, the dissent asserts that "we should review the district court's determination as to the effect of the federal agencies' voluntary cessation of allegedly illegal activities under the more deferential *abuse of discretion standard.*" *Id.* at 3 (emphasis added). This standard leads the dissent to conclude regarding the issue of recurrence (i.e., the first part of the *County of Los Angeles* test) that "we must agree with the district court and assume that the federal agencies may sidestep their self-mandated practices." *Id.* at 8. Likewise, the dissent is guided by this deferential standard in resolving the question of whether interim events have comprehensively and irrevocably eliminated the effects of the alleged violation (i.e., the second part of the *County of Los Angeles* test). Indicative of this deference, the dissent states that it "conclude[s] that the district court acted quite reasonably when it determined that the federal agencies cannot show that the effects of the ESA violation have been completely and irrevocably eradicated." *Id.* at 10 (internal quotation marks omitted). However, we must

-44-

disagree with our thoughtful colleague in dissent.  In particular, we respectfully

submit that the dissent's objection to the standard of review is misguided.  It

apparently overlooks the critical distinction between constitutional mootness and

prudential mootness—only the former kind of mootness is at issue here.

Courts recognize two kinds of mootness:  constitutional mootness and

prudential mootness.  *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629,

632-34 (1953); *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997);

*S. Utah Wilderness Alliance*, 110 F.3d at 727–28; *Bldg. & Constr. Dep't v.*

*Rockwell Int'l Corp.*, 7 F.3d 1487, 1491–92 (10th Cir. 1993); *New Mexico ex rel.*

*N.M. State Highway Dep't v. Goldschmidt*, 629 F.2d 665, 668–69 (10th Cir.

1980); *see also Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291

(D.C. Cir. 1980) (per curiam) ("The doctrine of mootness has two distinct

branches."); 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,

Federal Practice and Procedure § 3533.1, at 725 (3d ed. 2008).  Under the

constitutional-mootness doctrine, a federal court has jurisdiction over only

"cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  "[A]n actual

controversy must be extant at all stages of review, not merely at the time the

complaint is filed."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67

(1997) (internal quotation marks omitted).

Even if a case is not constitutionally moot, a court may dismiss the case

under the prudential-mootness doctrine if the case "is so attenuated that

considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant." *Fletcher*, 116 F.3d at 1321 (emphasis added) (internal quotation marks omitted); *S. Utah Wilderness Alliance*, 110 F.3d at 727 (stating that "[p]rudential mootness addresses not the power to grant relief but the court's *discretion* in the exercise of that power" (emphasis added) (internal quotation marks omitted)). "[P]rudential mootness arises out of the court's general discretion in formulating prospective equitable remedies . . . ." *Bldg. & Constr. Dep't*, 7 F.3d at 1492; *see Chamber of Commerce*, 627 F.2d at 291 ("The cousin of the mootness doctrine, in its strict Article III sense, is a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration."). This doctrine generally applies only to requests for injunctive or declaratory relief. *Bldg. & Constr. Dep't*, 7 F.3d at 1492 ("All the cases in which the prudential mootness concept has been applied have involved a request for prospective equitable relief by declaratory judgment or injunction."); *see Fletcher*, 116 F.3d at 1321; *S. Utah Wilderness Alliance*, 110 F.3d at 727.

A voluntary-cessation evaluation may be an important component of the overall analysis with respect to both constitutional and prudential mootness. "Under both Article III and prudential mootness doctrines, the central inquiry is essentially the same: have circumstances changed since the beginning of litigation that forestall any occasion for meaningful relief." *S. Utah Wilderness*

*Alliance*, 110 F.3d at 727. Under both mootness doctrines, courts must assess the likelihood that defendants will recommence the challenged, allegedly offensive conduct. *Compare Chihuahuan Grasslands Alliance*, 545 F.3d at 892 (noting in the constitutional context that "this [voluntary-cessation] exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct"), *with Fletcher*, 116 F.3d at 1321 (noting as to prudential mootness that "[a] court may refuse to grant relief where it appears that a change of circumstances renders it highly unlikely that the actions in question will be repeated"), *and Bldg. & Constr. Dep't*, 7 F.3d at 1492 (noting that, in cases involving prudential mootness, "a court may decline to grant declaratory or injunctive relief where it appears that a defendant, usually the government, has already changed or is in the process of changing its policies or where it appears that any repeat of the actions in question is otherwise highly unlikely").

Although we engage in similar factual inquiries to ascertain constitutional and prudential mootness, different standards of review apply to these doctrines. "The constitutional mootness question is a threshold inquiry because a live case or controversy is a constitutional prerequisite to federal jurisdiction. Our review of this question is *de novo*." *Fletcher*, 116 F.3d at 1321 (citation omitted); *see also Sample v. Johnson*, 771 F.2d 1335, 1338 (9th Cir. 1985) ("We apply a de novo standard for reviewing a district court's decision on subject matter

jurisdiction, and, concomitantly apply that standard in reviewing questions of mootness." (citation omitted)).  By contrast, "we review the district court's determination of prudential mootness for an *abuse of discretion*" because this doctrine "is concerned with the court's discretion to exercise its power to provide relief."  *Fletcher*, 116 F.3d at 1321 (emphasis added).  As a component of the mootness analysis, it naturally and ineluctably follows that the voluntary-cessation inquiry will be subject to the same standard of review as the overarching mootness question at issue—whether constitutional or prudential.  *Compare Unified Sch. Dist. No. 259*, 491 F.3d at 1149-50 (tacitly applying de novo standard of review to contention of voluntary cessation in the constitutional-mootness context), *with Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1524–25 (10th Cir. 1992) (explicitly applying abuse-of-discretion standard of review to assertion of voluntary cessation in the prudential-mootness context).

In this case, we apply a de novo standard of review because the case presents a question of constitutional mootness.  If we had concluded that the Environmental Group's ESA claims survived this jurisdictional-mootness inquiry, it might well have been appropriate to conduct a prudential-mootness analysis, given that the Environmental Groups seek only injunctive and declaratory relief.  *E.g.*, *Bldg. & Constr. Dep't*, 7 F.3d at 1492.  However, we need not reach this issue or definitively opine on it, because we have determined that the Environmental Groups' ESA claims are *constitutionally* moot.

The dissent mistakenly applies the abuse-of-discretion standard—that ordinarily is associated with the prudential-mootness doctrine—to the question of constitutional mootness in this case. To support the application of an abuse-of-discretion standard, the dissent primarily relies on (1) the Supreme Court's opinion in *W.T. Grant Co.*; (2) the Tenth Circuit's opinion in *Committee for the First Amendment v. Campbell*; and (3) opinions from other circuits.[18]  Dissent at

---

[18]  The dissent also relies, in part, on the Supreme Court's opinion in *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203–04 (1968).  Dissent at 3–4 (citing *Concentrated Phosphate* for the proposition that, "in the mootness context[,] . . . whether 'the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary . . . *is a matter for the trial judge*'" (quoting *Concentrated Phosphate*, 393 U.S. at 203–04)).  This reliance is misguided, however, because *Concentrated Phosphate* fits neatly within our dual analysis of constitutional and prudential mootness.  In *Concentrated Phosphate*, the Court initially employed a de novo review to determine that the case was not constitutionally moot.  393 U.S. at 203.  The Court subsequently noted that the appellees could attempt to show prudential mootness on remand—where the focus would be on whether, in an exercise of its discretion, the court may conclude that it is possible to provide truly meaningful injunctive relief, not on whether the court has the power to provide such relief. *Id.* at 203–04 ("Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief *unnecessary*.  This is a matter for the trial judge." (emphasis added) (citation omitted)).  Thus, the dissent quotes language from the prudential-mootness analysis of *Concentrated Phosphate*.

Courts and commentators agree that *Concentrated Phosphate* incorporates a prudential-mootness analysis. *See, e.g.*, *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182–89, 1182 n.10 (11th Cir. 2007) (holding that the case was not constitutionally moot and relying on *Concentrated Phosphate* to note that "nothing in this opinion should be read to preclude the district court on remand, and after appropriate review, from deciding that equitable relief is not warranted"); 13B Wright, Miller & Cooper, *supra*, § 3533.1, at 744 & n.33 ("The

(continued...)

-49-

2–3.  The dissent's reliance is misplaced.  Despite its arguments, *W.T. Grant Co.*

and *Committee for the First Amendment* actually are quite consistent with our

opinion.  The cases from the other circuits, moreover, are contrary to our

precedent and otherwise unpersuasive.

In *W.T. Grant Co.*, the Supreme Court established the dual analysis of

constitutional and prudential mootness.  345 U.S. at 632–34.  Based upon our

analysis below, we must respectfully conclude that the dissent has misguidedly

relied upon *W.T. Grant Co.*'s analysis related to prudential mootness in arguing

for use of an abuse-of-discretion standard in this case—where only constitutional

mootness is at issue.  Under the constitutional-mootness doctrine, the Court held

in *W.T. Grant Co.* that the defendants had not carried their "heavy" burden of

showing that their voluntary cessation of illegal interlocking corporate

directorates rendered the case moot.  *Id*. at 633.  Although the defendants

indicated that the interlocking corporate directorates "no longer existed and

disclaimed any intention to revive them," the Court reviewed the issue de novo

and determined that this averment was insufficient to render the case moot.  *Id.*

---

[18](...continued)
discretion to withhold injunctive relief in a case not technically moot is well
established." (citing *Concentrated Phosphate*, 393 U.S. at 202–04)); 13C Wright,
Miller & Cooper, *supra* note 15, § 3533.5, at 252–53, 253 n.33 ("Even if
discontinuance has not mooted the dispute, the court may exercise its remedial
discretion to deny any present remedy.  Remedial discretion is often described in
open-ended terms." (citing *Concentrated Phosphate*, 393 U.S. at 202–04)).

("Such a profession [as offered by defendants] does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts."); *id.* at 638 (Douglas, J., dissenting) (suggesting that the constitutional-mootness ruling of the district court was "now conceded [by the majority] to be erroneous").

Once the Court rejected the constitutional-mootness claim, it considered prudential mootness. *Id.* at 633–34. It was in this context that the Court in *W.T. Grant Co.* used the language relied upon by the dissent, which noted the obligation of the government, as plaintiff, to "demonstrate that there was no reasonable basis for the District Judge's decision." *Id.* at 634; *see* Dissent at 3 (quoting from *W.T. Grant Co.*, 345 U.S. at 633–34). More directly, under the prudential-mootness doctrine, the Court held that the government had not carried its burden of showing that the district court had abused its discretion in dismissing the case. *See W.T. Grant Co.*, 345 U.S. at 633–34; *id.* at 635–36 ("We conclude that, although the actions were *not* moot, no abuse of discretion has been demonstrated in the trial court's refusal to award injunctive relief." (emphasis added)).

To be sure, the Court in *W.T. Grant Co.* did not expressly label the different mootness doctrines. However, the opinion's language nonetheless clearly indicates that the Court applied two different mootness doctrines—with

-51-

different standards of review—in undertaking the voluntary-cessation inquiry.

Commentators have explicitly noted the distinct constitutional and prudential

components of *W.T. Grant Co.*'s mootness analysis. *See* 13B Wright, Miller &

Cooper, *supra*, § 3533.1, at 744 (discussing the Court's resolution of the

constitutional-mootness question and noting that *W.T. Grant Co.* is "[t]he most

important single illustration of the remedial doctrines," i.e., principles of

prudential mootness). And we have recognized expressly the prudential-mootness

dimension of *W.T. Grant Co.*'s analysis. *See Bldg. & Constr. Dep't*, 7 F.3d at

1492 (noting "the Supreme Court's original formulation of the test for prudential

mootness" in *W.T. Grant Co.*); *see also Goldschmidt*, 629 F.2d at 669 (citing *W.T.*

*Grant Co.* in discussing approvingly the proposition that "even if some remnant

of the original controversy be still alive, this is an instance where the courts, as a

matter of prudence and sound discretion, should stay their hand and withhold

drastic injunctive relief").

Thus, we need not quarrel with the dissent's contention that the Court

applied the abuse-of-discretion standard of review in *W.T. Grant Co.* The

problem for the dissent, however, is that the Court applied this standard with

respect to a mootness doctrine that is *not* germane to the resolution of this

case—that is, the prudential-mootness doctrine. Therefore, we respectfully

submit that the dissent's reliance on *W.T. Grant* in objecting to the application

here of the de novo standard of review is misplaced; at issue here is constitutional

-52-

mootness and that standard of review is appropriate. *See, e.g.*, *Chihuahuan Grasslands Alliance*, 545 F.3d at 891–94; *Unified Sch. Dist. No. 259*, 491 F.3d at 1148–50.

For similar reasons, the dissent hardly fares better with its standard-of-review objection by relying on our decision in *Committee for the First Amendment*. At bottom, that case involves application of the prudential-mootness doctrine; consequently, it was entirely appropriate for the court to apply an abuse-of-discretion standard of review. In *Committee for the First Amendment*, "Plaintiffs sought declaratory and injunctive (and later monetary) relief against various defendants in response to a decision by the Board of Regents (Regents) of Oklahoma State University (OSU) suspending the showing of *The Last Temptation of Christ*." 962 F.2d at 1519 (footnote omitted). The film was shown on the scheduled dates and, during the course of the litigation, the university adopted a new policy concerning use of university facilities for expressive purposes including the showing of movies, which we noted effected "major changes" from the expressive-activity policy that plaintiffs initially challenged. *Id.* at 1524–25.

The district court concluded that plaintiffs' claim for prospective relief (i.e., declaratory and injunctive relief) was moot. *Id.* at 1520, 1524. In providing background on the subject of mootness, we did briefly cite to cases associated with the constitutional-mootness doctrine, such as *County of Los Angeles*, and we

noted their holdings. *See id.* at 1524–25. However, when assessing the viability of plaintiffs' specific claim for prospective relief, we clearly were focused on the issue of prudential-mootness. This is evident in our heavy reliance from the outset to the end of our mootness analysis on "[t]he most important single illustration," 13B Wright, Miller & Cooper, *supra*, § 3533.1, at 744, of the prudential-mootness doctrine—that is, *W.T. Grant Co. Compare Comm. for the First Amendment*, 962 F.2d at 1519 (quoting in the *first* paragraph of the opinion from *W.T. Grant Co.*'s prudential-mootness analysis, which notes that the quantum of contrition that should be expected from an offender ceasing challenged activity is "'a question better addressed to the discretion of the trial court'" (quoting *W.T. Grant Co.*, 345 U.S. at 634)), *with id.* at 1525 (in the final paragraphs of its mootness analysis, quoting from *W.T. Grant Co.*'s prudential-mootness discussion, noting that "Plaintiffs . . . simply have not met their burden with respect to 'some cognizable danger of recurrent violations.'" (quoting *W.T. Grant Co.*, 345 U.S. at 632)).

More specifically, in *Committee for the First Amendment*, we set forth the prudential-mootness test from *W.T. Grant Co.* and indicated that we would review the district court's mootness ruling for an abuse of discretion. *Id.* at 1524–25. Regarding whether the inquiry was one of prudential mootness, it is telling that we assessed whether the district court could have reasonably concluded in exercising its "general discretion in formulating prospective equitable remedies,"

-54-

*Bldg. & Constr. Dep't*, 7 F.3d at 1492, that providing prospective relief here was not appropriate, by actually examining ourselves the contours of the specific relief sought by plaintiffs. *See Comm. for the First Amendment*, 962 F.2d at 1525–26 ("What Plaintiffs seek is an injunction framed no more narrowly than requiring the Defendants to follow the First Amendment concerning future on-campus activities of every sort. No specific facts anchor such a command rendering enforcement problematic in a university environment where hundreds of decisions concerning extracurricular use of facilities are made every academic year."). In other words, our focus was on the district court's exercise of discretion in fashioning equitable remedies and not on whether there was "[a]n actual controversy." *Arizonans for Official English*, 520 U.S. at 67 (internal quotation marks omitted). We concluded that the district court did not "abuse its discretion insofar as it determined that plaintiffs' request for injunctive relief was moot." *Comm. for the First Amendment*, 962 F.3d at 1524; *see id*. at 1526.

Thus, the flaw in the dissent's reliance on *Committee for the First Amendment*—a prudential-mootness case predicated on *W.T. Grant Co.*'s prudential-mootness analysis—should be readily apparent: this is *not* a prudential-mootness case. Accordingly, as with *W.T. Grant Co.*, we have no basis to attack the dissent's contention that *Committee for the First Amendment* applied an abuse-of-discretion standard of review. But it did so with regard to a mootness doctrine that is *not* at issue here—prudential mootness. With respect to the

-55-

mootness doctrine that *is* at issue, constitutional-mootness, our case law is clear—the standard of review is de novo. *E.g.*, *Fletcher*, 116 F.3d at 1321.

Finally, the dissent looks to cases from the Seventh and Second Circuits for support. Dissent at 4 (citing *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994); *Harrison & Burrowes Bridge Constructors*, *Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992)). These cases, however, are unpersuasive and do not square with our own precedent (such as *Fletcher*), which recognizes the distinction regarding the applicable standard of review between the doctrines of constitutional and prudential mootness and, more specifically, holds that only in the case of prudential mootness do we apply an abuse-of-discretion standard of review, because in such a case we are "concerned with the [district] court's discretion to exercise its power to provide relief." *Fletcher*, 116 F.3d at 1321; *cf. id.* ("The constitutional mootness question is a threshold inquiry because a live case or controversy is a constitutional prerequisite to federal jurisdiction. Our review of this question is *de novo*." (citation omitted)). In *Kikumura*, the Seventh Circuit appears to have fallen victim to the same mistake that we respectfully have attributed to the dissent—mapping the prudential-mootness analysis of *W.T. Grant Co.* onto a case involving constitutional mootness. For example, in a mootness discussion that cites to *W.T. Grant Co.*, the Seventh Circuit states that "[d]etermining whether an official's voluntary cessation from engaging in conduct challenged as unconstitutional renders a case moot calls for an exercise of judicial

-56-

discretion."  *Kikumura*, 28 F.3d at 598.

*Kikumura* may be at odds with other Seventh Circuit cases, which appear not to have made the same mistake, but instead have recognized that the constitutional-mootness question—including the subsidiary question of voluntary cessation—implicates the subject-matter jurisdiction of federal courts and is reviewed de novo.  In *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, for example, the Seventh Circuit reviewed de novo the question of whether to apply the voluntary-cessation exception to a constitutional-mootness issue.  326 F.3d 924, 928–31 (7th Cir. 1996).  In that context, the Seventh Circuit stated:  "Whether a case has been rendered moot is a question of law that we review de novo. . . . A question of mootness arises when, as here, a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief."  *Id.* at 929 (citations omitted); *see Walsh v. U.S. Dep't of Veterans Affairs*, 400 F.3d 535, 536–37 (7th Cir. 2005) (noting that "[w]e review the district court's decision [entering summary judgment on mootness grounds] *de novo*," and proceeding to address the specific question of voluntary cessation de novo); *cf. Evers v. Astrue*, 536 F.3d 651, 656 (7th Cir. 2008) ("This case begins and ends with our determination of subject-matter jurisdiction. . . . [W]e review a district court's dismissal on mootness grounds *de novo*." (citations omitted)); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) ("We review *de novo* the district court's grant

of a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which includes a dismissal on mootness grounds."). Irrespective of whether *Kikumura* is inconsistent with Seventh Circuit precedent, however, insofar as *Kikumura* calls for the application of an abuse-of-discretion standard of review to the question of constitutional mootness it is inconsistent with *our* precedent, and we accordingly decline to follow it.

For somewhat similar reasons, the Second Circuit's decision in *Harrison & Burrowes Bridge Constructors* is contrary to our precedent and unpersuasive. There, like the *Kikimura* court, the Second Circuit mistakenly relied upon the language of *W.T. Grant Co.* concerning *prudential* mootness, in announcing the standard of review for a question of *constitutional* mootness. *Harrison & Burrowes Bridge Constructors*, 981 F.2d at 59. The plaintiffs sought "declaratory and injunctive relief with respect to the state's minority business program." *Id.* at 58. The state's passage of an emergency regulation that "suspended enforcement of the program's goals" presented an issue of voluntary cessation to the district court. *Id.* at 58–59. The district court ruled that the state's action mooted the plaintiffs' claim for declaratory and injunctive relief. *Id.* at 59. Citing *W.T. Grant Co.*, the Second Circuit concluded that an abuse-of-discretion standard of review was appropriately applied to the district court's ruling, and it determined that "[t]he district court did not abuse its discretion in dismissing [plaintiffs'] complaints as moot because the emergency regulation suspends application of the

-58-

minority enterprise goals on state-funded contracts." *Id.*

*Harrison & Burrowes Bridge Constructors* is contrary to our precedent because—in mistaken reliance on the prudential-mootness analysis of *W.T. Grant Co.*—it applies an abuse-of-discretion standard, rather than a de novo standard, to a question of constitutional mootness. Moreover, even if its application here was not barred by our precedent, we would be wary of adopting the rule of *Harrison & Burrowes Bridge Constructors.* At least one Second Circuit case has intimated that the abuse-of-discretion standard articulated in *Harrison & Burrowes Bridge Constructors* is limited to the context of voluntary cessation. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 n.3 (2d Cir. 1998) ("The Defendants here have not voluntarily agreed to cease enforcing Section 10-110 against [plaintiff] or to grant [plaintiff's] permit requests in the future. Therefore, the abuse-of-discretion standard does not apply and we review the district court's determination of mootness under the customary de novo standard."). However, the Supreme Court has clearly held that voluntary cessation is part and parcel of the constitutional-mootness analysis and can result in a finding that an action or claim is moot. *See City of Los Angeles*, 440 U.S. at 631. Accordingly, voluntary cessation implicates the subject-matter jurisdiction of federal courts, and our circuit *and* also the Second Circuit have recognized that subject-matter-jurisdiction questions—including those involving mootness—are reviewed de novo. *Compare Fletcher*, 116 F.3d at 1321 ("The constitutional mootness

question is a threshold inquiry because a live case or controversy is a constitutional prerequisite to federal jurisdiction.  Our review of this question is *de novo*." (citation omitted)), *with Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 377 n.16 (2d Cir. 2004)  ("[T]he condition of mootness is not a defense that could be waived by [a defendant], but rather is a condition that deprives the court of subject matter jurisdiction." (alterations in original and internal quotation marks omitted)); *and United States v. New York City Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996) ("A ruling that a case is not moot is reviewed *de novo*.  This case is not moot unless no reasonable expectation remains that the policy will be reinstituted.").  In sum, we respectfully conclude that the dissent's reliance on *Harrison & Burrowes Bridge Constructors* is misplaced.  The case is contrary to our precedent and otherwise unpersuasive.

For the foregoing reasons, we must disagree with our thoughtful colleague in dissent concerning the standard of review that is applicable to the mootness question in this case.  We thus proceed to the issue of vacatur.

## B.    Vacatur

Because the district court was without subject-matter jurisdiction, and thus without the power to enter the November 2005 judgment, that judgment must be

vacated.[19]  However, the appellants also have challenged the district court's denial

---

    [19]       "If the district court lacked jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit."  *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1163 (10th Cir. 2004) (internal quotation marks omitted).  When a case becomes moot prior to final adjudication, the district court was without jurisdiction to enter the judgment, and "*vacatur* and dismissal [of the judgment] is automatic."  *Goldin v. Bartholow*, 166 F.3d 710, 718 (5th Cir. 1999).  Similarly, because the district court was without jurisdiction at the time it issued the November 22, 2005 memorandum opinion, we also vacate that opinion.

    Defendant-Intervenor-Appellee Albuquerque-Bernalillo County Water Utility Authority ("Authority") asks us to "uphold the propriety of the 2005 Opinion and Final Judgment solely with respect to the dismissal of the San Juan-Chama claims with prejudice and the approval of the stipulation and joint motion to dismiss, even if, *arguendo*, the district court generally lacked subject-matter jurisdiction on mootness grounds."  Authority Br. at 5.  We are constrained to deny this request, however.  As the State of New Mexico argues, *see* State of New Mexico Reply Br. at 18, the district court's dismissal with prejudice of the San Juan-Chama claims pursuant to the parties' stipulation and dismissal agreement was a judgment on the merits.  *See Brooks v. Barbour Energy Corp.*, 804 F.2d 1144, 1146 (10th Cir. 1986) ("[The dismissal] was a voluntary dismissal with prejudice upon an order of the court, based on the settlement agreement.  This dismissal should be considered a judgment on the merits because it was entered pursuant to a settlement that resolved the substance of the disputed claims . . . .  [A] dismissal with prejudice by order of the court is a judgment on the merits.");  *see also Clark v. Haas Group, Inc.*, 953 F.2d 1235, 1238 (10th Cir. 1992) ("[T]he stipulated, voluntary dismissal of Clark's first suit, approved by the court with prejudice, was a judgment on the merits.").  Under our precedent, the Authority's contrary assertions are simply untenable.  In particular, the Authority's suggestion that the distinction between dismissals with prejudice and those without is one without a difference is wholly without merit.  *See* Authority Br. at 11 n.5 (noting that "[n]othing in the applicable jurisprudence indicates that dismissal with prejudice should be evaluated differently" than dismissals without prejudice).  Not only is the Authority's suggestion called into doubt by its own vigorous efforts to characterize the district court's dismissal as the latter (i.e., without prejudice), but it also is legally unsupportable.  As the Supreme Court has made

(continued...)

of their motions to vacate the district court's 2002 orders. Thus, we must also consider whether the circumstances under which this case became moot require us to vacate those orders of the district court. We review the district court's denial of a motion to vacate for abuse of discretion. *See Amoco Oil Co. v. U.S. Envtl. Prot. Agency*, 231 F.3d 694, 697 (10th Cir. 2000).

"Whether any opinion should be vacated on the basis of mootness is an equitable question." *Minnow III*, 355 F.3d at 1220 (citing *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994)).[20] Thus, we consider "'the nature and character of the conditions which have caused the case to become moot.'" *U.S. Bancorp Mortgage Co.*, 513 U.S. at 24 (quoting *United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft*, 239 U.S. 466, 477–78 (1916)). In general, "[w]hen a case becomes moot on appeal, the ordinary course is to vacate the judgment below and remand with directions to dismiss." *Kan.*

---

[19](...continued)
clear, it is precisely when "the court proposes to issue a judgment on the merits" that "jurisdiction is vital." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (alteration and internal quotation marks omitted). Therefore, because the district court lacked subject-matter jurisdiction, it was not empowered to enter judgment pursuant to the parties' stipulations concerning the dismissal of the San Juan-Chama claims with prejudice, and that judgment cannot stand.

[20]     Although *U.S. Bancorp Mortgage Co.* addresses appellate court vacatur, its rationale also governs the district court's decision whether to vacate its own judgment pursuant to Fed. R. Civ. P. 60(b). *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 118, 121 (4th Cir. 2000).

*Judicial Review v. Stout*, 562 F.3d 1240, 1248 (10th Cir. 2009). This is because "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortgage Co.*, 513 U.S. at 25. "Consequently, it is frequently appropriate for an appellate court to vacate the judgment below when mootness results from happenstance or the actions of the prevailing party." *Wyoming*, 414 F.3d at 1213.

On the other hand, if the party seeking vacatur has caused mootness, generally we do not order vacatur. *Minnow III*, 355 F.3d at 1220; *see also Amoco Oil. Co.*, 231 F.3d at 699 ("We have . . . recognized that granting vacatur to a party who both causes mootness and pursues dismissal based on mootness serves only the interests of that party."); *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 76 F.3d 1142, 1145 (10th Cir. 1996) ("The City both caused mootness and sought dismissal on the basis of mootness, and now requests a *de facto* reversal on the claim that it has abandoned. This one-sided use of the mootness doctrine does not appear to serve any interest other than the City's own.").

However, in *McClendon*, where we ordered vacatur, we stressed that the appropriateness of vacatur must be determined "on the basis of the particular circumstances." 100 F.3d at 868 (internal quotation marks omitted); *see also*

*Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 353 (D.C. Cir. 1997) (noting this *McClendon* emphasis on particular circumstances and concluding that it "suggest[s] that [the Tenth Circuit's decision in] *19 Solid Waste Department Mechanics* should be viewed as simply a specific instance where refusing vacatur served the public interest and not as establishing a general rule against vacatur where mootness results from voluntary governmental action."). In *McClendon*, the parties entered a court-superintended settlement agreement designed to reduce inmate crowding in a city/county-run detention center. 100 F.3d at 865–66. Approximately six months later, the defendants informed the court that population caps in the settlement agreement had been exceeded. *Id.* at 866. After several hearings, the defendants appealed certain portions of the district court's orders regarding court inspection of temporary housing. *Id.* at 866–67. While the case was on appeal, the defendants succeeded in fully complying with the settlement agreement. *Id.* at 867.

We determined that, not only did the defendants' compliance with the settlement agreement moot the appeal, but that portions of the district court's orders relating to the inspections should be vacated. *Id.* at 868. Compliance with the settlement agreement did not constitute manipulation of the judicial process "by deliberately aborting appellate review to avoid a decision on the issues. Rather, defendants' conduct in complying with the settlement agreement constitutes responsible governmental conduct to be commended." *Id.*

Turning now to the district court's ruling, the court predicated its vacatur ruling on the assumption that the case was moot. The court then proceeded to analyze whether vacating its 2002 orders was appropriate and in the public interest and ruled that vacatur relief should not be granted. The district court determined that neither issuance of the 2003 B.O. nor legislative enactment of the 2004 minnow rider could "fairly be described as happenstance." J.A. at 249. The court further observed that the appellants intended to manipulate the judicial process by lobbying Congress for passage of the minnow riders. *Id*. at 249–50. Moreover, in weighing whether the public interest supported vacatur, the court noted the possible guidance that its orders could provide in addressing similar ESA issues: "If the issue arises again in litigation in connection with this or other endangered species in the middle Rio Grande system or elsewhere, this Court's factual and legal analysis may provide a baseline to inform the debate, even though this Court's decisions are not binding precedent for other courts." *Id.* at 250. Lastly, the court also noted that "[a]n additional reason for denying the vacatur motions is to make clear to the public that nothing improper motivated the [district court's] discretion decision." *Id.* at 251 n.9. In that regard, the court expressed concerns regarding critical comments of certain state and local New Mexico governmental officials, which had been reported in the media. The court feared that the comments might lead the public to believe that the court had engaged in misconduct in performing its judicial duties and that the court's

rulings concerning the scope-of-discretion issue were something "other than principled judicial interpretations of the law on difficult issues." *Id.*

As to this last point, we strongly reject any suggestion that the esteemed and able district court judge in this case has discharged his responsibilities with anything other than the highest levels of integrity and impartiality and are especially troubled insofar as such suggestions have emanated from the ranks of New Mexico governmental officials who should be aware of the weight their words tend to carry in the public's mind. However, we are ultimately constrained to conclude that the district court abused its discretion in declining to vacate its earlier orders.

To begin, our resolution of the mootness issue necessarily impacts our examination of "where the equities . . . lie" in this case. *Minnow III*, 355 F.3d at 1221. We have already determined that the record did not support the view that the FWS's issuance of the 2003 B.O. and Reclamation's adoption of that B.O. and its RPAs stemmed from an objective to "manipulate[] the judicial process" by depriving the district court of jurisdiction. *McClendon*, 100 F.3d at 868. And we reached that conclusion even after acknowledging that the federal agencies' actions were in part in direct response to the district court's rulings, rather than the product of a self-initiated decision to change regulatory direction. Therefore, we would not consider it to be reasonable to conclude—as the district court

-66-

apparently did—that the federal agencies' voluntary actions in connection with the 2003 B.O. should weigh against them and militate against vacatur.

Indeed, with reference to *McClendon*, the district court here described the issuance of the 2003 B.O. as "commendable governmental conduct" but was concerned by what it called the "hedge"—that is, Reclamation's reservation of the option of complying with the 2003 B.O.'s RPAs under its narrow view of its discretion—a view that the district court had rejected. J.A. at 249. However, as we have discussed in addressing voluntary cessation, Reclamation's reservation of the option of employing its narrow view of its discretion does not, under the unique circumstances of this case, make it significantly likely that it will revert to the *precise approach* toward the exercise of its discretion that the Environmental Groups challenged in the 2001 B.O. and 2002 B.O. and that the district court rejected. Therefore, we would not consider it to be reasonable to impute to the federal agencies, by virtue of their issuance and adoption of the 2003 B.O., a manipulative intent to divest the district court of jurisdiction and to rid themselves of the district court's rulings regarding the scope-of-discretion issue—rulings that were rendered in the context of the superseded biological opinions. Consequently, to the extent that the district court's vacatur decision was predicated on an imputation of such manipulative intent, we conclude that its decision amounted to an abuse of discretion.

Significantly, we agree with the federal agencies that the issuance of the 2003 B.O. was not a major factor in the district court's vacatur decision, but rather it turned on Congress's enactment of the minnow riders. And, regarding that basis, we must conclude that the district court's reasoning is even more problematic and moves us even more strongly to conclude that the court's vacatur ruling amounted to an abuse of discretion. In particular, the district court endorsed the view that the appellants' alleged lobbying of Congress for the minnow riders should weigh against them in the equitable balance. We disagree.

Passage of legislation that moots a case is a voluntary act which could, conceivably, weigh against vacatur. *See Nat'l Black Police Ass'n*, 108 F.3d at 351. But at issue here is not whether Congress should be denied vacatur of the district court's prior orders because it enacted the minnow riders. The federal agencies and other appellants were before the district court seeking that equitable relief, not Congress. However, the district court essentially imputed congressional action to the appellants. Yet the acts of the legislature are not the acts of executive branch agencies, states, or private parties. *See id*. at 353. Only Congress controls the enactment of federal legislation. *See Minnow III*, 355 F.3d at 1221 ("The actions of the Congressional delegation[] are not acts of the parties in this case, however. Thus, we cannot agree that the Government and the Congressional delegation from New Mexico are guilty of acts that should give rise to equitable rights for the Appellees.").

Even assuming that the appellants actively lobbied the New Mexico congressional delegation, they were certainly not assured of a particular outcome. To the extent that the minnow riders contributed to the mootness of the case, the case became moot as a consequence of the actions of a third party, Congress. Passage of the minnow riders was simply beyond the appellants' control.[21]  *See Valero Terrestrial Corp.*, 211 F.3d at 121 (concluding, when mootness was caused by state legislature's amendment of statute and not acts by executive branch officials before the court, district court was correct to vacate its judgment); *Jones v. Temmer*, 57 F.3d 921, 922, 923 (10th Cir. 1995) (vacating judgment when plaintiff's suit against Colorado Public Utilities Commission was mooted by Colorado legislature's amendment of challenged taxicab regulations).

Therefore, we conclude that the district court erred in attributing the conduct of a third party—Congress—to the appellants in determining whether equitable considerations militated in favor of vacatur. Such error in significantly

_____

[21]     The dissent states that "without the voluntary adoption of the 2003 Biological Opinion there could certainly be no riders to it," and it faults us for not acknowledging that the 2003 B.O. was "the condition precedent to that Congressional action." Dissent at 18. However, logically, it should be patent that just because Congress may have responded to the issuance of the 2003 B.O. by enacting the minnow riders, does not establish—or even give rise to a reasonable inference—that the federal agencies controlled Congress's action in enacting the riders. Therefore, the district court could not reasonably attribute Congress's action concerning the minnow riders to the federal agencies in the equitable vacatur calculus simply by virtue of their issuance and adoption of the 2003 B.O.

basing its denial of vacatur on this improper and irrelevant factor (i.e., Congress'

legislative action) ineluctably provides a strong indication that the district court

abused its discretion. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d

312, 316 (8th Cir. 2009) ("An abuse of discretion occurs where the district court

fails to consider an important factor, *gives significant weight to an irrelevant or*

*improper factor*, or commits a clear error of judgment in weighing those factors."

(emphasis added)); *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)

(noting that "when we say that a decision is discretionary . . . we do not mean that

the district court may do whatever pleases it" and that an abuse of discretion "can

occur," *inter alia*, "when an irrelevant or improper factor is considered and given

significant weight"); *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966)

(noting that "the denial of suspension to an eligible alien would be an abuse of

discretion if it were," *inter alia*, grounded "on an impermissible basis such as . . .

considerations that Congress could not have intended to make relevant" (internal

quotation marks omitted)).  Under the facts presented here, we conclude that, by

relying significantly on the enactment of the minnow riders to support its vacatur

ruling, the court abused its discretion.

Additionally, vacatur is appropriate to prevent "a judgment, unreviewable

because of mootness, from spawning any legal consequences." *United States v.*

*Munsingwear, Inc.*, 340 U.S. 36, 41 (1950).  By its terms, *Munsingwear* applies to

final judgments.  Nonetheless, we have applied its rationale to vacate

interlocutory decisions that have no collateral or preclusive effect. *See Affiliated Ute Citizens of the State of Utah v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 22 F.3d 254, 256 (10th Cir. 1994). Although the district court has fashioned its rulings concerning the scope-of-discretion issue thoughtfully and with considerable skill, contrary to the court's analysis, we conclude that this factor should not necessarily result in a denial of vacatur, and under the circumstances of this case it was unreasonable for court to deny vacatur. Should the scope-of-discretion issue arise in the future with respect to the Valley or other locales, it will almost invariably present a whole array of new factual and scientific issues for litigation by Reclamation and other federal agencies, as well as by any concerned private parties. Accordingly, it is at least open to question the extent to which the district court's rulings would provide meaningful guidance to future litigants.

At bottom, however, we conclude that, under the facts of this case, it would be unreasonable for the district court to have concluded that Reclamation has operated in a manner that should require it to labor in the future under any legal consequences that might be spawned by the district court's (non-precedential) 2002 orders. Vacatur of the district court's 2002 orders "clears the path for future relitigation of the issues between the parties" and diminishes the chances that the prior orders can be used for their persuasive value against any of the parties in subsequent proceedings. *McClendon*, 100 F.3d at 868 (quoting *Marc Dev., Inc. v.*

-71-

*FDIC*, 12 F.3d 948, 949 (10th Cir. 1993) (en banc) (per curiam)). Ultimately, "[m]oreover, since the district court's opinion[s] will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts [and litigants] will be able to consult [their] reasoning." *Nat'l Black Police Ass'n*, 108 F.3d at 354.

Thus, under the particular circumstances presented by this case, we determine that the district court abused its discretion when it denied appellants' vacatur request and, for the reasons noted above, we conclude that the court's decision is reversible error.[22] *See also id.* ("In this context, absent additional evidence of an illegitimate motive, we believe the general rule in favor of vacatur still applies. Needless to say, this does not mean that vacatur should be granted in all cases of this kind."). We are cognizant that both the district court and the parties have expended enormous amounts of time and resources in this litigation. Furthermore, in our view, the district court's 2002 orders were entered with the highest integrity and only after careful and informed deliberation. And, as noted, we condemn any suggestion by public officials to the contrary. However, we are constrained to conclude that the district court abused its discretion in refusing to vacate its 2002 orders.

---

[22] We need not decide whether any one of the district court's manifest errors of judgment discussed above would, standing alone, constitute grounds for reversal of its order denying vacatur.

## III. CONCLUSION

For the foregoing reasons, we **DISMISS** the appeal and **REMAND** to the district court with directions to **VACATE** its (1) April 19, 2002 memorandum opinion and order; (2) September 23, 2002 memorandum opinion and findings of fact and conclusions of law; (3) September 23, 2002 order and partial final judgment; (4) November 22, 2005 memorandum opinion; and (5) November 22, 2005 order and final judgment; and to **DISMISS** the Environmental Groups' Third Amended Complaint relating to their scope-of-consultation claim under the Endangered Species Act.[23]

---

[23]  Our clerk's office provisionally denied as inconsistent with our court's panel-assignment practices federal appellees' motion to reassign this appeal to a prior merits panel involved in an earlier phase of the parties' litigation relating to the Project. We decline to reconsider that decision and, in any event, would deny the motion as moot.

*Rio Grande Silvery Minnow v. Bureau of Reclamation*, Nos. 05-2399, 06-2020, 06-2021

**HENRY, J.**, dissenting.

I appreciate my colleagues' thorough and thoughtful examination of the issues in this complicated decade-long case. Although arguably "agua es vida" (water is life), especially in the West, I believe this case is more than a simple battle about allocating resources between the silvery minnow (and analogously situated plants and animals) and humans. There are a variety of options available, and the Supreme Court and Congress recognize that "the value of endangered species [is] incalculable." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 187 (1978) (internal quotation marks and citations omitted). The Rio Grande, the "Big River," occupies a pivotal role in agriculture, water supply, fishing, and ceremonial uses; and as Congress has clearly realized, the silvery minnow and other species are important parts of that ecosystem.

I write separately because (1) I see differently the standard of review for the district court's determination of the Environmental Groups' request for injunctive relief; (2) even under de novo review, I am not convinced that the claim is moot; (3) as to the merits, I agree with the district court that the Bureau of Reclamation ("Reclamation") must consult with the Fish and Wildlife Service ("FWS") over the full scope of Reclamation's discretion concerning Middle Rio Grande Project operations; and finally (4) I believe the district court acted within its discretion when it denied the federal agencies' motion for vacatur.

**I.     The district court did not abuse its discretion when it determined that the case was not mooted by the federal agencies' voluntary cessation of their allegedly illegal activities.**

A.     Standard of review

To start, I disagree with the majority that we must engage in de novo review of the district court's application of the voluntary cessation exception to mootness.  I have no quarrel with the distinction between constitutional and prudential mootness, which the majority thoroughly explains.  Nevertheless, in my view, our precedent does not require the bifurcated voluntary cessation inquiry that the majority suggests (i.e., a de novo examination if the district court held the case to be constitutionally moot and an abuse of discretion review if it held the case to be prudentially moot).  Many of the voluntary cessation decisions invoked by the majority do not distinguish between the two doctrines, and lacking explicit guidance from controlling precedent, I think that we should review district courts' voluntary cessation decisions, whether involving constitutional or prudential mootness, for an abuse of discretion.

As the district court noted, "[w]hen a defendant has voluntarily ceased challenged conduct, in order to prove mootness the defendant has the burden to establish both (1) that it is absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur, and (2) that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

-2-

469 F. Supp. 2d. 1003, 1008 (D.N.M. 2005) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632-34 (1953)). "As with most mootness questions, the answer depends in large part on a uniquely individualized process of prediction centered on the facts and parties of each case. Predictions must be made as to the probability of recurrence, the magnitude of any injury that would result, and the feasibility of preventing any injury by a future suit. The judgment that is made on the basis of these predictions may be shaped by the character of the plaintiff . . . [and] by the character of the defendant." 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.5, at 236 (3d ed. 2008).

This fact-based, case-specific, multi-part inquiry plays to the strengths of the district court, particularly when, as here, that court had a first-hand opportunity to assess these factors over years of litigation. We should give due regard to the district court's "feel for the case that we could not match without an inordinate expenditure of time." *Cook v. City of Chicago*, 192 F.3d 693, 697 (7th Cir. 1999).

Thus, as the Environmental Groups argue, and the Supreme Court recognizes, we should review the district court's determination as to the effect of the federal agencies' voluntary cessation of allegedly illegal activities under the

more deferential abuse of discretion standard. *W.T. Grant*, 345 U.S. at 633, 634 ("The necessary determination is that there exists some cognizable danger of recurrent violation," based on a standard of whether there was any "reasonable basis for the District Court's decision"); *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1534 (10th Cir. 1992) (reviewing whether the "district court abused its discretion" in the determination that the voluntary cessation of unlawful conduct made the case moot); *see also United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203-04 (1968) (finding in the mootness context that whether "the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary . . . *is a matter for the trial judge*") (emphasis added).

Other circuits agree: "Determining whether an official's voluntary cessation from engaging in conduct challenged as unconstitutional renders a case moot calls for an exercise of judicial discretion." *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994). "Although defendant bears a heavy burden when it seeks to have a case dismissed as moot, whether it should be dismissed or not lies within the sound discretion of the district court, and 'a strong showing of abuse must be made to reverse it.'" *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992) (quoting *W.T. Grant*, 345 U.S. at 633) (citation omitted).

We define abuse of discretion as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1331 (10th Cir. 1996) (internal quotation marks and citation omitted). I see no abuse of discretion and certainly no strong showing of such, nor do I view the district court's careful consideration of this case as whimsical or unreasonable. Further, as explained below, I would reach the same conclusion under de novo review.

B. The voluntary cessation exception to mootness

As the district court noted, "[w]hen a defendant has voluntarily ceased challenged conduct, in order to prove mootness the defendant has the burden to establish both (1) that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, and (2) that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." 469 F. Supp. 2d. at 1008 (citing *County of Los Angeles*, 440 U.S. at 631; *W.T. Grant*, 345 U.S. at 632-34). Under both prongs of the inquiry, I am not convinced that the defendants have carried their heavy burden.

1. Recurrence

As to the first prong of recurrence, in determining that the Environmental Groups' challenges are moot, the majority fails to sufficiently consider the formidable burden that rests upon the federal agencies to satisfy this "stringent"

test. *Concentrated Phosphate Export Ass'n,* 393 U.S. at 203 ("The test for mootness in cases such as this is a *stringent* one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'") (quoting *W.T. Grant*, 345 U.S. at 632) (emphasis added); *County of Los Angeles*, 440 U.S. at 631; *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004). Although the majority acknowledges the existence of this "heavy burden," Maj. Op. at 33 (citations omitted), it apparently concludes that "it is 'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Tandy*, 380 F.3d at 1291 (quoting *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). But the district court, which has a better "feel" for this epochal litigation, concluded otherwise. *See Cook*, 192 F.3d at 697 ("The judge acquire[s] a feel for the case that we could not match without an inordinate expenditure of time."). Indeed, the Supreme Court has stated that the determination of the likelihood of further violations in the mootness context "is a matter for the trial judge." *Concentrated Phosphate Export Ass'n,* 393 U.S. at 203-04.

The majority accurately recounts the increased "solicitude" we may afford the voluntary actions by governmental actors, Maj. Op. at 33-34 n.15, and it notes Wright, Miller & Cooper's suggestion that the "process of prediction also is

shaped by the character of the defendant—claims of discontinuance by public officials are more apt to be trusted than like claims by private defendants." *Id.* (quoting 13C Wright, Miller & Cooper, *supra* § 3533.5, at 236, 238-39). Some courts, may "trust public defendants to honor a professed commitment to changed ways." *Id.* at 34 n.15 (quoting Wright, Miller & Cooper, *supra* § 3533.7, at 319, 321); *see also Coral Springs St. Sys.*, 371 F.3d 1320, 1333 (11th Cir. 2004) (in a moot case, defendant "expressly disavowed any intention of defending" the ceased conduct).

However, whether or not public defendants are more trustworthy than private defendants, here we have no "claim of discontinuance" or "a professed commitment to changed ways." Reviewing for an abuse of discretion or de novo, the record is clear that the federal agencies have made no similar commitment here (indeed, their refusal has been described as "dogged"), likely because it is a commitment the federal agencies are unwilling to make. 469 F. Supp. 2d at 1009. The federal agencies' only argument in support of mootness is that the Environmental Groups have not challenged the 2003 Biological Opinion. *Cf. Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) ("In the present case, as the promulgation of work rules appears to be solely within the discretion of the MDOC, there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action terminates.").

The federal agencies' unwillingness to claim a commitment to change their ways does not discomfit the majority. The majority is reassured by the federal agencies' "concrete step" in issuing the 2003 Biological Opinion, and views such a step as something more than a "mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease." Maj. Op. at 38 (quoting *Burbank v. Twomey*, 520 F.2d 744, 748 (7th Cir. 1975)). But, in my view, the 2003 Biological Opinion seems far from the "secure foundation" for mootness that a genuine self-correction may provide. *Id.* at 37 (quoting Wright, Miller & Cooper, *supra* § 3533.7, at 326 ("[S]elf-correction again provides a secure foundation for mootness so long as it seems genuine.")). Moreover, earlier in this litigation, the federal agencies explained that even after adopting the 2003 Biological Opinion, "the legal question of Reclamation's discretion to use Project water for endangered species may well recur," noting that the "Bureau might be unable to obtain sufficient water to comply with the [Biological Opinion's] flow requirements." *See* Fed. Supp. Br. on Mootness, 10th Cir. Nos. 02-2254 et al., p. 5.

Furthermore, I am uncertain how we could conclude there was no "reasonable basis" for the district court's decision, *W.T. Grant*, 345 U.S. at 634, while also recognizing that the district court's 2002 order "played a role in the FWS's issuance of the 2003 [Biological Opinion]." Maj. Op. at 36. As the

majority acknowledges, the issuance of the 2003 Biological Opinion was at least "in part in direct response to the district court's rulings." *Id.* at 66. And, if, as the court observes, "Reclamation has not abandoned its narrow view of the scope of its discretion," *id.* at 38-39, it is far from absolutely clear that the federal agencies have completely discontinued the practice or that the allegedly wrongful behavior could not reasonably be expected to recur. *See id.* at 41; *Tandy*, 380 F.3d at 1291 (quoting *Friends of the Earth*, 528 U.S. at 190); *W.T. Grant*, 345 U.S. at 633 (noting that district court considers "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations" when determining the risk of recurrence).

Here, the 2003 Biological Opinion, together with the 2003 and 2004 minnow riders, demonstrate that "Congress deliberately left the issue of discretion over [Middle Rio Grande Project] water for decision by the federal agencies and the courts." 469 F. Supp. 2d at 1009. And Reclamation, perhaps somewhat uncharacteristically, appears to shrug its shoulders at the suggestion it has full discretion. If history serves as any lesson, given the (1) federal agencies' grudging resistance (described by the district court as their "dogged refusal") and (2) the equivocal nature of the 2003 Biological Opinion, I believe we must agree with the district court and assume that the federal agencies may sidestep their self-mandated practices. *See* 469 F. Supp. 2d at 1009 ("[The federal agencies]

have failed to establish that it is absolutely clear that they would not return to their wrongful use of an impermissibly narrow and limited scope of discretion in future ESA consultations."); *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."). The district court's well-reasoned conclusion, "together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *W.T. Grant*, 345 U.S. at 632.

### 2. Eradication of the effects of the alleged violation

The second prong of the Supreme Court's voluntary cessation calculus is "[that] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631. The majority concludes, I believe correctly, that the 2001 and 2002 Biological Opinions have been superseded, but the majority seems to draw the incorrect conclusion that the effects of these Biological Opinions have been eradicated. The district court acted reasonably in expanding its inquiry beyond the four corners of the Biological Opinions to the actual effects of the agencies' conduct on the minnow's habitat: "[E]ven though an unusually wet spring in 2005 resulted in a dramatic increase in minnow spawning, it may never be known how the agencies'

-10-

dogged refusal to consider using project water in past years to prevent unnecessary river drying has affected the downward spiral of the silvery minnow." 469 F. Supp. 2d at 1010. As the recently released Rio Grande Silvery Minnow Recovery Plan observes, "Threats to [the silvery minnow] and its habitat indicate[] that it could be expected to become extinct in the foreseeable future." Rio Grande Silvery Minnow Recovery Plan, First Revision, Southwest Region, U.S. FWS, Approved 01/15/10. *Cf. County of Los Angeles*, 440 U.S. at 633 (holding that the "second condition of mootness [has been met] because petitioners' compliance . . . has *completely cured* any discriminatory effects of the . . . proposal") (emphasis added). Thus I conclude that the district court acted quite reasonably when it determined that the federal agencies cannot show "that the effects of the ESA violation have been completely and irrevocably eradicated." 469 F. Supp. 2d at 1010. Furthermore, even reviewing the record de novo, I would conclude that the federal defendants cannot show a complete cure of the ESA violation.

## II. Reclamation must consult with FWS.

Having determined that the case is not moot, I will briefly touch upon the merits. I agree with the district court that final resolution of the legal issue concerning Reclamation's discretionary authority over the Middle Rio Grande Project will greatly serve the public interest, and I would similarly conclude that

-11-

"[i]n any future consultations under the Endangered Species Act, the Bureau of Reclamation must consult with the Fish and Wildlife Service over the full scope of the Bureau's discretion concerning Middle Rio Grande Project operations." *Id.* at 1016 (citing its April 19, 2002 Memorandum Opinion and Order (Doc. No. 371), and its September 23, 2002 Memorandum Opinion and Findings of Fact and Conclusions of Law (Doc. No. 445), and its Order and Partial Final Judgment (Doc. No. 446)). Section 7 of the ESA establishes a consultation process to insure that "any action authorized, funded, or carried out by [a federal] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat. . . ." 16 U.S.C. § 1536(a)(2).

The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth.*, 437 U.S. at 185. The *Tennessee Valley Authority* Court noted statements from legislative proceedings preceding the ESA, which tellingly remain valid over three decades later: "As we homogenize the habitats in which these plants and animals evolved, and as we increase the pressure for products that they are in a position to supply (usually unwillingly) we threaten their–and our own–genetic heritage. . . . The value of this genetic heritage is, quite literally, incalculable. . . . From the most narrow possible point of view, it is in the best interests of mankind to minimize

-12-

the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask." *Id*. at 178-79 (internal quotation marks and citations omitted).

As the Court explained, Section 7 of the ESA imposes requirements upon heads of all federal departments and agencies to use their authorities to facilitate programs for the protection of endangered species. *Id.* at 182-83. At the same time, those agencies must ensure their actions will not "jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184. When fully considering the implications of Reclamation's responsibilities against this unambiguous backdrop, rather than cast the facts as a showdown between man and nature, we must abide by Congress's view that "the value of endangered species [is] incalculable." *Id.* at 187 (internal quotation marks and citation omitted). Man has options that nature does not. There are no hardship exemptions under the ESA for federal agencies, and none is called for here. The district court's reasoning, which modestly requires Reclamation to merely consult with FWS, abides by the plain language of the ESA.

-13-

III.    **The district court did not abuse its discretion when it denied the federal agencies' motion for vacatur.**

Even if the district court had no reasonable basis to find that the case was not rendered moot by the federal agencies' voluntary cessation of the allegedly illegal activities, I continue to see the district court's decision denying vacatur as one well within its discretion, and would affirm.  469 F. Supp. 2d at 1014 (concluding that "[m]ovants have failed to demonstrate their entitlement to the extraordinary remedy of vacatur of this Court's prior decisions").

A.    Standard of review

Vacatur is an equitable remedy, indeed, an "extraordinary" one, and the decision whether to grant vacatur is entrusted to the district court's discretion. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). Again, the district court is better equipped than we are to fashion equitable relief, and we afford it considerable discretion in doing so.  *See Boutwell v. Keating*, 399 F.3d 1203, 1207 (10th Cir. 2005) (noting the district court's "'considerable discretion' in fashioning equitable remedies" (quoting *Stichting Mayflower Recreational Fonds v. Newpark Res., Inc.*, 917 F.2d 1239, 1245 (10th Cir. 1990)); *Downie v. Indep. Drivers Ass'n Pension Plan*, 934 F.2d 1168, 1170 (10th Cir. 1991) ("We review the application of the district court's equitable remedy for abuse of discretion.").  The burden is on "the party seeking relief from the status quo" to demonstrate "equitable entitlement to the extraordinary remedy of

-14-

vacatur." *U.S. Bancorp*, 513 U.S. at 26. As Judge Porfilio said, writing for the court in our previous decision in *Rio Grande Silvery Minnow v. Keys*, 355 F.3d 1215, 1222 (10th Cir. 2004) ("*Minnow III*"), when examining the moving party's motion for vacatur, "the district court should determine whether there are unresolved issues that remain to be tried." The district court here has made that determination, and has thoughtfully considered and denied the federal agencies' motion for vacatur.

B.      Voluntary action of the party seeking relief from the judgment below

The principal factor we consider in determining how to dispose of moot cases is "whether the party seeking relief from the judgment below caused the mootness by voluntary action." *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 76 F.3d 1142, 1144 (10th Cir. 1996) (quoting *U.S. Bancorp*, 513 U.S. at 24). Vacatur is ordinarily appropriate unless the losing party appealing the judgment was somehow responsible for making the case unreviewable. *U.S. Bancorp*, 513 U.S. at 24-25; *Stewart v. Blackwell*, 473 F.3d 692, 693 (6th Cir. 2007) (stating that "vacatur is generally appropriate to avoid entrenching a decision rendered unreviewable through no fault of the losing party"). Thus, we have ordered vacatur "when mootness occurs through happenstance–circumstances not attributable to the parties–or . . . the unilateral action of the party who prevailed in the lower court." *Chihuahuan Grasslands Alliance v.*

-15-

*Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71-72 (1997) (internal quotation marks and citation omitted)).

In contrast, "[v]acatur is generally not appropriate when mootness is a result of a voluntary act of a nonprevailing party." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1213 (10th Cir. 2005). To permit a party "to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would–quite apart from any considerations of fairness to the parties–disturb the orderly operation of the federal judicial system." *U.S. Bancorp,* 513 U.S. at 27; *Houston Chronicle Pub. Co. v. City of League City*, 488 F.3d 613, 616, 620 (5th Cir. 2007) (where city "voluntarily" and "selectively" repealed ordinance, and where city did not "show[] its repealing the Ordinance provisions was not in response to the district court judgment," "the equitable factors . . . weigh[ed] against vacating the district court's injunction").

Here, FWS issued the 2003 Biological Opinion, and Reclamation adopted it. This case is similar to *Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004), a case that exhibits courts' reluctance to vacate opinions and orders. In *Tandy*, the Wichita transit system rescinded its earlier policy that had given discretion to bus drivers to deny wheelchair-bound passengers entry to an accessible bus on certain routes. *Id.* at 1280. We held that the challenges to

Wichita's driver-discretion policy were moot because all of the City's buses had been retrofitted to be lift-accessible, because there were no remaining inaccessible bus routes, and because Wichita Transit had instructed its drivers to deploy lifts at all bus stops for all disabled riders. *Id.* at 1290-91. Reasoning that Wichita did "not present[] any equitable consideration which would justify vacatur despite the fact that mootness was brought about by [the transit system's] voluntary compliance," we declined to vacate the district court's injunction against the driver-discretion policy. *Id.* at 1292.

Given the mootness determination here, as in *Tandy*, there is no question that FWS's and Reclamation's voluntary actions contributed to mooting the case. *See Tafas v. Kappos*, 586 F.3d 1369, 1371 (Fed. Cir. 2009) (denying vacatur where "the agency itself has voluntarily withdrawn the regulations and thus set the stage for a declaration of mootness"). The majority should disentangle what it considers the district court's incorrect analysis of the mootness issue from the vacatur issue. That the district court reached a different mootness finding is legally irrelevant to the present analysis because the district court separately and neutrally considered the vacatur issue assuming mootness. The reasons for deferring to the district court's feeling for the case remain.

I am not persuaded by the majority's comparison of the acts of the federal agencies here with those of the defendant officials in *McClendon v. City of*

*Albuquerque*, 100 F.3d 863 (10th Cir. 1996). In *McClendon,* we echoed the concerns of the Supreme Court when we stated that we determine the appropriateness of vacatur "on the basis of the particular circumstances." *Id.* at 868; *U.S. Bancorp*, 513 U.S. at 24 (In deciding whether to vacate a district court decision, we must consider "the nature and character of the conditions which have caused the case to become moot.") (internal quotation marks and citations omitted). Although the majority suggests that we "stressed" the particular circumstances inquiry in *McClendon*, Maj. Op. at 63, we also heeded the "principle condition" as to "whether the party seeking relief from the judgment below caused the mootness by voluntary action." *U.S. Bancorp*, 513 U.S. at 24.

In *McClendon*'s specific circumstances, "the parties entered a court-superintended settlement agreement designed to reduce inmate crowding in a city/county-run detention center." Maj. Op. at 64. During the course of the appeal, the defendants complied with the settlement agreement, and we held the appeal to be moot. We noted the circumstances to be "certainly unusual" and noted that it was "defendants' actions in complying with the settlement agreement by creating adequate temporary space and opening a new facility that have rendered this appeal moot." *McClendon*, 100 F.3d at 868. We were convinced that the defendants' repeated efforts to comply with the agreement warranted vacatur: "defendants, who had undisputedly violated the settlement agreement . .

-18-

. have since voluntarily permitted inspections," opened a new detention facility, and presented evidence that there were planned population reductions and facility expansions scheduled to preclude another emergency overcrowding situation. *Id.* at 867. We concluded that such "responsible government conduct" did not warrant the defendants from bearing untoward consequences, and we ordered the vacatur of certain orders. *Id.* at 868.

Here, as the majority notes, we also have "unique circumstances." Maj. Op. at 67. The federal agencies voluntarily adopted the 2003 Biological Opinion, which contains one proposal where Reclamation assumed it had "no discretion to limit contract deliveries to benefit the Minnow" and a second proposal where Reclamation assumed "discretion to limit diversions, curtail water storage, and release stored water." *Id.* at 15. Unlike the enumerated and discrete acts that the government defendants presented in *McClendon*, here we have only the federal agencies' either/or "voluntary actions," *id.* at 66-67, which included adopting the non-position taking 2003 Biological Opinion. There is little assurance of follow through given the 2003 Biological Opinion's options. The district court was correct to engage in a *U.S. Bancorp* analysis as to whether the federal agencies' governmental action warranted the exceptional remedy of vacatur.

Also, I am at a loss as to why the majority "agree[s] with the federal agencies that the issuance of the 2003 [Biological Opinion] was not a major factor

in the district court's vacatur decision, but rather [the decision] turned on Congress's enactment of the minnow riders." Maj. Op. at 68. The majority continues: "And, regarding that basis, we must conclude that the district court's reasoning is even more problematic and moves us even more strongly to conclude that the court's vacatur ruling amounted to an abuse of discretion." *Id.*

The district court quite clearly stated that "[t]he mootness of the discretion rulings in this Court's April 19, 2002 decision resulted in part from voluntary action by FWS, a federal agency, i.e., adoption of the 2003 [Biological Opinion], and in part from legislative action in the form of the minnow riders." 469 F. Supp. 2d at 1014. In light of this language, it seems difficult to dispute that the 2003 Biological Opinion was "a major factor in the district court's vacatur decision." Maj. Op. at 68.

Without the agencies' adoption of the 2003 Biological Opinion, there would most likely be no mootness of this case. 469 F. Supp. 2d. at 1010. And without with the voluntary adoption of the 2003 Biological Opinion there could certainly be no riders to it. The federal agencies' actions may have mooted the case, but we must recognize that their voluntary conduct also "may disentitle [them] to the relief [they] seek[]." *Sanders v. United States*, 373 U.S. 1, 17 (1963) (citing *Fay v. Noia*, 372 U.S. 391, 438 (1963)). While the district court attributes the voluntary action to first, the issuance of the 2003 Biological

-20-

Opinion, and second, to the subsequent legislative riders, the majority focuses on Congressional action as an intervening cause without explaining the 2003 Biological Opinion, the condition precedent to that Congressional action.

Furthermore, we must not undertake de novo review of this decision not to vacate, rather we must afford it considerable discretion. *Boutwell*, 399 F.3d at 1207. The court concludes that "under the facts of this case, it would be unreasonable for the district court to have concluded that Reclamation has operated in a manner that should require it to labor in the future under any legal consequences that might be spawned by the district court's (non-precedential) 2002 orders." Maj. Op. at 71. It continues to note that "[v]acatur of the district court's 2002 orders 'clears the path for future relitigation of the issues between the parties' and diminishes the chances that the prior orders can be used for their persuasive value against any of the parties in subsequent proceedings." *Id.* (quoting *McClendon*, 100 F.3d at 868). The majority seems to find implicit error in the district court's reasoning. I see no "arbitrary, capricious, whimsical, or manifestly unreasonable judgment," *Brown*, 101 F.3d at 1331, in the district court's sound fashioning of equitable relief when it denied the "extraordinary remedy of vacatur." *U.S. Bancorp*, 513 U.S. at 26.

-21-

C.    Public interest

Finally, because vacatur is an equitable remedy, we, like the district court, must also consider the public interest. *U.S. Bancorp,* 513 U.S. at 26-27 ("Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.") (quoting *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 40 (1993) (Stevens, J., dissenting)); *Amoco Oil Co. v. EPA*, 231 F.3d 694, 699 (10th Cir. 2000). Focusing its analysis on the responsible government conduct of the agencies, the majority seems to have neglected the gravity of this inquiry. "Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments. To allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would–quite apart from any considerations of fairness to the parties–disturb the orderly operation of the federal judicial system." *U.S. Bancorp,* 513 U.S. at 27; *cf. Wyoming*, 414 F.3d at 1213 (holding that vacatur of the district court's order was appropriate "because the party seeking appellate relief [wa]s not the party responsible for mooting the case, [and] *the orderly operation of the appellate system is not being frustrated*") (emphasis added).

-22-

The district court acted well within its wide discretion when it determined that "exceptional circumstances" did not include the "disposing of cases[] whose merits are beyond judicial power to consider, on the basis of judicial estimates regarding their merits." *U.S. Bancorp*, 513 U.S. at 28-29. The district court emphasized the public interest and "'orderly operation of the federal judicial system'" and followed the Supreme Court's "reject[ion of] the notion that there is inherently more value in the relitigation of issues disposed of in judgments that have become moot than in the 'benefits that flow to litigants and the public from the resolution of legal questions.'" 469 F. Supp. 2d at 1013 (quoting *U.S. Bancorp*, 513 U.S. at 27).

Simply put, the public interest would not be served by erasing a decade of well-thought out jurisprudence that "may be helpful to other courts to the extent that it is persuasive." *Okla. Radio Assocs. v. FDIC*, 3 F.3d 1436, 1444 (10th Cir. 1993) (quoting *Clark Equip. Co. v. Lift Parts Mfg. Co., Inc.*, 972 F.2d 817, 820 (7th Cir. 1992)). As the district court aptly noted, "[t]he benefit of keeping the prior decisions intact weighs heavily because doing so prevents the uncertainty that prevailed in the past." 469 F. Supp. 2d at 1015. The majority's approach infringes upon the district court's discretion, which was exercised "in the manner most consonant to justice." *U.S. Bancorp*, 513 U.S. at 24 (internal quotation marks and citations omitted). This multi-year litigation clearly shows why our

precedents have come to vest discretion in the trial judge who has so carefully

and painstakingly attempted to resolve this case.